IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-02414-MSK-CBS

JAMES L. CARRERO,

       Plaintiff,

v.

ARAPAHOE COUNTY SHERIFF'S OFFICE,

       Defendant.

_____

## OPINION AND ORDER GRANTING, IN PART, MOTION TO DISMISS
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Partial

Summary Judgment and to Dismiss (**# 7**), the Plaintiff's response (**# 16**), and the Defendant's

reply (**# 21**); and the Defendant's Motion for a More Definite Statement (**# 8**), the Plaintiff's

response (**# 13**), and the Defendant's reply (**# 20**).

## FACTS

According to the Complaint (**# 1**), the Plaintiff, a Hispanic male, was hired by the

Defendant in 1986.  He alleges that, since 1988, the Defendant has permitted a racially and

sexually hostile working environment to persist; has discriminated against him because of his race

in evaluations, promotions, assignments, and discipline, among other things; and retaliated against

him for filing grievances and charges of discrimination with the Equal Employment Opportunity

Commission ("EEOC").  He contends that these practices ultimately compelled him to resign his

position in March 2004.

1

The Complaint alleges three causes of action: (i) a claim entitled "First Amendment," which appears to be a claim that he was retaliated against for exercising his First Amendment rights, in violation of 42 U.S.C. § 1983; (ii) racial discrimination, harassment, and retaliation in violation of 42 U.S.C. § 1981; and (iii) racial discrimination, harassment, and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*

The Defendant filed the instant "Combined Motion to Dismiss and for Partial Summary Judgment"[1] (**# 7**), primarily arguing that "some of" the Plaintiff's claims are untimely. Specifically, the Defendant contends that: (i) any claims of First Amendment retaliation arising more than two years prior to the filing of the Complaint are time-barred; (ii) claims of race discrimination under § 1981 arising more than four years prior to the filing of the Complaint are time-barred; and (iii) claims under Title VII encompassed by EEOC charges filed by the Plaintiff in 1998 and 2001 are untimely, as the Plaintiff failed to commence suit within 90 days of receiving a right-to-sue letter on those charges; (iv) the Plaintiff failed to exhaust his administrative remedies with respect to any acts of discrimination or retaliation occurring more than 300 days prior to his December 29, 2003 EEOC charge; (v)that the Plaintiff failed to exhaust administrative remedies for discrete events occurring after his December 29, 2003 EEOC charge; (vi) that the Plaintiff's demand for punitive damages under 42 U.S.C. § 1981 and § 1983 are barred; and (vii) that the Arapahoe County Sheriff's Department is not an entity subject to suit. Separately, the

---

[1]The Court discourages motions which seek dismissal under Fed. R. Civ. P. 12 and summary judgment under Fed. R. Civ. P. 56 as alternatives. The standards and analysis to be applied to the two types of motions differ, and hybrid motions often fail to properly analyze the claims separately under each rule. It may be more efficient for the counsel making the motion to engage in a single generalized analysis, but that efficiency comes at the expense of the decisional process which must ensure that the motion is decided correctly under the appropriate rule.

Defendant filed the instant Motion for a More Definite Statement **(# 8)**, contending that the Plaintiff failed to identify numerous individuals who allegedly committed the acts described in the Complaint.

The Plaintiff responded **(# 16)** to the Motion to Dismiss, acknowledging that he "does not seek to assert claims for incidents occurring outside the statute of limtiations."  Specifically, he states: (i) that he does not intend to assert claims under 42 U.S.C. § 1981 or § 1983 for events falling outside the relevant statutes of limitation; (ii) that his claim of a hostile working environment under Title VII is timely under *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); (iii) that he properly exhausted his Title VII claims after December 2003 by supplementing his EEOC charge; (iv) that he does not seek punitive damages to the extent such damages are prohibited by law; and (v) that the parties have agreed to substitute Arapahoe County Sheriff Grayson Robinson, in his official capacity, as the Defendant in this case.  The Plaintiff also responded **(# 13)** to the Defendant's motion for a more definite statement, denying that additional detail was necessary.

In reply, the Defendant argues: (i) in the Plaintiff's December 2003 EEOC charge, he did not allege the existence of a hostile working environment, and did not assert the existence of a continuing violation, thereby resulting in his failure to exhaust those claims under Title VII; (ii) that the Plaintiff failed to exhaust his constructive discharge claim by asserting it in an EEOC charge; and (iii) that the punitive damages claims should be stricken.  The Defendant also file a reply, reiterating its belief that a more definite statement of the Plaintiff's claims is appropriate.

## ANALYSIS

### A.  Standard of review

Because the Defendants' substantive motion turns solely on the allegations of the Complaint and the content of documents – EEOC charges – referred to therein, it is appropriate to treat it as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  The Court must limit its review to the four corners of the Complaint, but may also consider documents attached to the Complaint as exhibits, *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001), as well as unattached documents which are referred to in the Complaint and central to the plaintiff's claim, so long as the authenticity of such documents is undisputed. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

The Court will direct a more definite statement under Fed. Civ. P. 12(e) if it finds the Complaint is so vague or ambiguous that the Defendant cannot reasonably be required to frame a responsive pleading. *Franklin v. Shelton*, 250 F.3d 92, 95 (10th Cir. 1998).

**B.  Timeliness of § 1981 and § 1983 claims**

Based on the Plaintiff's representation that he is not seeking relief for events occurring outside the statute of limitations on his § 1981 and § 1983 claims, the Defendant's Motion to Dismiss those claims is moot.[2]

**C.  Title VII claims**

Title VII requires that all claims of discrimination or retaliation be preceded by filing a charge of discrimination with the EEOC and receipt of a "Right-to-Sue" letter.  42 U.S.C. § 2000e-5.  The interplay of the various components of Title VII creates a system of administrative requirements and statutes of limtiations that affect the timeliness of a given claim.  Specifically, a person aggrieved by an act of discrimination or retaliation must file an EEOC charge within 300 days of the unlawful act.  42 U.S.C. § 2000e-5(e)(1).  If the EEOC elects not to pursue the claim on its own, it will dismiss the charge by means of a "Right-to-Sue" letter, and the employee must then commence suit within 90 days of that letter.  42 U.S.C § 2000e-5(f)(1).

Each discrete act of discrimination or retaliation is treated separately, and each must be the subject of a timely EEOC charge in order to exhaust administrative remedies, even though each discrete act might also be part of a larger pattern or practice of discrimination or retaliation.  *Morgan*, 536 U.S. at 113.  The sole exception to this rule is a hostile environment claim; so long

---

[2]Notwithstanding the Plaintiff's statement that he does not seek to recover for events occurring outside the statute of limitations, there is ample room for future disputes as to the meaning of that concession – *e.g.* whether the Plaintiff will contend that otherwise untimely acts are swept up in a "continuing violation,"whether the parties will engage in discovery on the untimely events, etc.  It would appear to the Court that it is essential for the parties to continue to confer as to precisely what events comprise the § 1981 and § 1983 claims, so as to minimize future disagreements and the need for additional motion practice.

as one act that is part of the hostile environment is timely, the entirety of the hostile environment claim is timely.  *Id.* at 116-17.

It is critical to distinguish between discrete acts and hostile environment claims, particularly where the hostile environment is alleged to include both events that, on their own, are not separately actionable (*i.e.* harassing comments, discriminatory employment actions that are not materially adverse), as well as individual discrete acts.  *Morgan* makes clear that a discrete act must be the subject of a timely charge, and thus, an employee who fails to file a timely charge with respect to a discrete act cannot thereafter revive the ability to seek damages for the discrete act by claiming it to be part of a hostile environment.  536 U.S. at 115, 120 n. 12.

The contents of the EEOC charge define the contours of any subsequent lawsuit that may be brought.  At one time, the 10th Circuit recognized that the employee could pursue not only the acts alleged in the charge, but also unalleged actions like or reasonably related to the allegations of the charge and events of a similar character occurring while the charge was pending.  *See e.g. Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994).  However, the 10th Circuit has held that, after *Morgan*, the exception permitting the employee to sue on post-charge acts of discrimination is no longer viable.  *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003); *Annett v. University of Kansas*, 371 F.3d 1233, 1238 (10th Cir. 2004).  Although the 10th Circuit has not expressly ruled so in a published opinion, the same logic suggests that the exception permitting the employee to sue on uncharged acts of a similar character to those asserted in a charge does not survive in the aftermath of *Morgan*.  *See Dunlap v. Kansas Dept. of Health and*

Environment, 127 Fed.Appx. 433, 438 (10th Cir. 2005) (unpublished)[3] ("The incidents which she alleges to have been retaliatory conduct by the employer are discrete incidents . . . subject to the requirement of administrative exhaustion, unrelieved by our prior doctrine which excused the exhaustion requirement for acts reasonably related to the acts included in the administrative charge"), *but see Mitchell v. City and County of Denver*, 112 Fed.Appx. 662, 666-67 (10th Cir. 2004) (unpublished) (considering whether uncharged acts under "reasonably related" doctrine).

　　With these principles in mind, the Court turns to the specific facts of this case. It is undisputed that the Plaintiff filed three charges of discrimination with the EEOC. The first two charges, filed in October 1998 and January 2001, were dismissed by the EEOC with an accompanying Right-to-Sue letter, but the Plaintiff did not commence a lawsuit pursuant to those charges within 90 days. Consequently, the claims in those charges are time-barred by 42 U.S.C. § 2000e-5(f)(1). The Plaintiff filed a third charge with the EEOC on or about December 29, 2003. That charge alleged that the Plaintiff has been the victim of retaliation "since before February 2003" in that he was denied four transfers, training, and was subjected to a demotion and termination that were subsequently overturned. In a separate paragraph, the charge alleges that, since filing his prior EEOC charges, he had been denied 21 transfer requests and 12 training opportunities. The charge also alleges that the Plaintiff has been subjected to discrimination on the basis of his Hispanic origin, and giving the charge a broad reading, it appears that the Plaintiff

---

　　[3]Both *Dunlap* and *Mitchell* are cited by this Court pursuant to 10th Cir. R. 36.3(b), in that they helpfully address the continuing viability of the "reasonably related" doctrine after *Morgan*, and that the 10th Circuit does not appear to have addressed this particular issue in any published opinion. Pursuant to Rule 36.3(c), copies of both decisions are attached hereto.

is alleging that his transfer and training denials and his discharge are alleged to be discriminatory as well as retaliatory.

In light of *Morgan*, it is clear that in this lawsuit, the Plaintiff can only recover for discrete events of allegedly discriminatory and/or retaliatory denials of transfer requests, denials of training, or discipline that occurred on or after March 4, 2003, 300 days prior to the filing of the charge.   Moreover, in light of *Martinez* and subsequent cases, it appears that the Plaintiff is barred from proceeding on any discrete acts arising <u>after</u> December 29, 2003, as those acts were not the subject of a separate charge, and can no longer be rescued by reference to the "reasonably related" or "post-filing events" doctrines.   Thus, the scope of the Title VII claims to be asserted in this case are those acts of discriminatory and/or retaliatory denials of training and denials of transfer occurring between March 4 and December 29, 2003, as well as the discipline imposed on the Plaintiff in and about October 2003.

The Plaintiff raises two arguments in support of a more expanded Title VII claim: (i) that his charge is sufficient to assert a hostile environment harassment claim as well, thereby permitting him to assert that claim here; and (ii) that he supplemented the December 29, 2003 charge so as to assert additional post-filing acts of discrimination and retaliation.   Turning to the first argument, to exhaust a claim, the employee must set forth the nature of the claim in sufficient detail that a reasonable reader would understand the charge to be asserting a hostile environment claim.  *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 (10th Cir. 1988), 29 C.F.R. § 1601.12(b) (requiring charge to be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of").  A hostile environment claim lies where an employee has been subjected to "discriminatory intimidation, ridicule, and insult that is sufficiently

severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). The December 29, 2003 charge does not give any indication that the Plaintiff claims to have been subjected to any discriminatory intimidation, ridicule, or insult distinct from the particular discrete denials of training and transfers and the discipline imposed on him. The closest it comes to alleging such behavior is a claim that "I was informed by a co-worker that my supervisor asked daily about my performance and my ethics." This is insufficient to give reasonable notice to the Defendant that the Plaintiff was alleging a hostile environment claim, and thus, the Court finds that the Plaintiff failed to exhaust any such claim in his December 29, 2003 charge.

The Plaintiff alleges, however, that he supplemented the December 29, 2003 charge, and attaches two letters addressed to the EEOC to his brief, one signed by the Plaintiff himself and dated April 13, 2004, and the other signed by the Plaintiff's counsel and dated June 28, 2004. A claim that is not adequately presented in the initial charge may nevertheless be exhausted if presented in a supplement to that charge. *See Gunnell*, 152 F.3d at 1260. The letter written by the Plaintiff himself recites the circumstances in which his October 2003 termination was rescinded, and how, upon the Plaintiff's return to work, he was reassigned to a job duty that he felt was unsafe and ultimately compelled him to resign. The letter makes two mentions of a "hostile work environment," but does not actually allege any instances of discriminatory intimidation, ridicule, or insult. Rather, the Plaintiff's letter appears to use the expression "hostile work environment" in a colloquial sense, referring to the Plaintiff's perception that the Defendant was hostile towards him. Having reviewed the entirety of the letter, mindful of the fact that the Plaintiff lacks legal sophistication, the Court nevertheless finds that the Plaintiff's April 13, 2004

9

letter is insufficient to supplement his pending EEOC charge with a hostile environment harassment claim.

The Plaintiff's counsel's June 28, 2004 letter is only slightly more detailed.  In it, the Plaintiff's counsel asserts that "The Sheriff, in response to Mr. Carrero's complaints about being called a 'fucking Mexican' to the EEOC, transffered Mr. Carrero to the jail"; "The Sheriff created a hostile work environment"; "Respondent does not deny that Mr. Carrero was . . . returned to the same hostile work environment."   However, most of the Plaintiff's counsel's references to a "hostile work environment" are conclusory; they certainly are not "sufficiently precise to . . . describe generally the action or practices complained of."  29 C.F.R. § 1601.12(b).  The only instance in which the Plaintiff's counsel identifies any particular instance of harassment is his indirect reference to the Sheriff calling the Plaintiff a "fucking Mexican" prior to transferring him to the jail, but it is clear from the context that this refers to a situation that occurred prior to and was referenced in a prior EEOC charge filed by the Plaintiff.  A reasonable reader of the charge would not assume that the Plaintiff was intending to assert a new or continuing hostile environment claim by means of this letter.

Accordingly, the Court concludes that the Plaintiff has failed to administratively exhaust any claim for hostile environment harassment, and to the extent the Plaintiff asserts such a claim in the Complaint, that claim is dismissed.  The Court notes, however, that the Plaintiff's supplemental letters to the EEOC are sufficient to identify allegedly discriminatory events occurring after December 29, 2003, up to and including the date of the Plaintiff's resignation, sufficient to exhaust any disparate treatment discrimination or retaliation claims based on those post-charge events.  Thus, the Plaintiff's Title VII claim is deemed to include any discrete acts of

discrimination or retaliation occurring after March 4, 2003 through the date of the Plaintiff's

resignation, but no hostile environment harassment claim.

### D.  Punitive damages

The Defendant's motion focused its challenge on the Plaintiff's ability to claim punitive

damages through his § 1981 and § 1983 claims, and the Plaintiff has conceded (albeit in a

somewhat ambiguous manner) that he does not intend to seek such damages on those claims.

Contrary to the Defendant's suggestion, however, this admission does not warrant dismissal of

the Plaintiff's demand for punitive damages.   The parties have not addressed the availability of

punitive damages through the Plaintiff's Title VII claim, *see* 42 U.S.C. § 1981a(b)(1), and thus,

the Court declines to dismiss the demand for punitive damages at this time.

### E.  Substitution of parties

The parties agree that the present Defendant, the Arapahoe County Sheriff's Department,

is not properly named, and that the actual Defendant should be Grayson Robinson, Sheriff of

Arapahoe County, in his official capacity.  The Court will deem the Complaint and caption

amended to make this correction.  However, all future pleadings should reflect this change.

### F.  Motion for more definite statement

The Court denies the Defendant's motion for a more definite statement.  Although it

agrees that much of the Complaint is vague as to who allegedly committed various acts it

describes, many of the offending allegations fall clearly outside the temporal scope of the claims as

narrowed by this ruling.  To the extent that allegations of events falling within the statute of

limitations are vague, the Defendant may elect to deny them upon information and belief, and, if

necessary, amend those denials after clarifying the details of the allegations in discovery.

11

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss (# 7) is **GRANTED IN PART**, insofar as the Plaintiff's Title VII hostile work environment harassment claim is **DISMISSED** as unexhausted, and **DENIED IN PART**, in all other respects, subject to the Plaintiff's admission that he does not seek to assert claims under § 1981 and § 1983 for events outside the respective statutes of limitation, and subject to the Court's finding that the Plaintiff's Title VII claim relates only to events occurring on or after March 4, 2003.  The Defendant's Motion for a More Definite Statement (# 8) is **DENIED**.   Pursuant to the parties' agreement, the caption of this case is amended to replace Defendant Arapahoe County Sheriff's Department with "Grayson Robinson, Sheriff of Arapahoe County, in his official capacity," and the allegations in the Complaint are deemed amended accordingly.

Dated this 11th day of September, 2006

BY THE COURT:

Marcia S. Krieger
United States District Judge

12

**127 Fed.Appx. 433**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,
Tenth Circuit.
Elke DUNLAP, Plaintiff-Appellant,
v.
State of KANSAS, DEPARTMENT OF HEALTH AND ENVIRONMENT,
Defendant-Appellee.
**No. 02-3331.**

April 1, 2005.

**Background:** German-born female state employee asserted discrimination and retaliation claims against her employer under Title VII. The District Court, 211 F.Supp.2d 1334, Rogers, Senior District Judge granted employer's motion for summary judgment, and employee appealed.

 **Holdings:** The Court of Appeals, William J. Holloway, Jr., Circuit Judge, held that:

 (1) employee failed to show that she was subjected to a work environment of severe or pervasive hostility;

 (2) employee failed to prove the existence of an adverse employment action; and

 (3) incidents which employee alleged to have been retaliatory conduct were discrete incidents subject to the requirement of administrative exhaustion.

 Affirmed.

West Headnotes

**[1] Civil Rights** 🔑**1147**
78k1147 Most Cited Cases

**[1] Civil Rights** 🔑**1185**
78k1185 Most Cited Cases
Evidence presented by a German-born female state employee was insufficient to show that she was subjected to a work environment of severe or pervasive hostility, so as to establish a Title VII claim of a hostile work environment; incidents in which a supervisor would pretend not to understand her accent were insufficient to show an atmosphere of severe or pervasive bias, and while she overheard him mocking other accents, those accents were not similar to the employee's, and that conduct was not aimed at her.   Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** 🔑**1138**
78k1138 Most Cited Cases

**[2] Civil Rights** 🔑**1172**
78k1172 Most Cited Cases
German-born female state employee failed to prove the existence of an adverse employment action, as required to prevail on her Title VII disparate treatment claim; a letter of concern or of reprimand was not made a part of her personnel file and there was no allegation of adverse consequences following from the incident.   Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights** 🔑**1516**
78k1516 Most Cited Cases

**[3] States** 🔑**53**
360k53 Most Cited Cases

Incidents which German-born female state employee alleged to have been retaliatory conduct by her employer prohibited by Title VII were discrete incidents subject to the requirement of administrative exhaustion; prior doctrine which excused the exhaustion requirement for acts reasonably related to the acts included in an administrative charge was no longer valid.  Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**\*433** Pantaleon Florez, Jr., Florez & Frost, Topeka, KS, for Plaintiff-Appellant.

**\*434** M.J. Willoughby, Stephen O. Phillips, Office of the Attorney General, Topeka, KS, for Defendant-Appellee.

Before HARTZ, HOLLOWAY and McKAY, Circuit Judges.

### ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

WILLIAM J. HOLLOWAY, JR., Circuit Judge.

Plaintiff-appellant Elke Dunlap sued her employer, the State of Kansas Department of Health and Environment, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e(16), alleging discrimination based on gender and national origin and unlawful retaliation. The district judge granted the defendant's motion for summary judgment, and Dunlap now appeals.

## I

The facts, as viewed through the prism of the defendant's summary judgment motion, are set out in detail in the district court's thorough opinion, 211 F.Supp.2d 1334 (D.Kan.2002), and we will present here only a summary. Plaintiff was born in 1944 in Germany and lived there until she was 19 years old.  She then married an American and moved to this country in 1963.  She still speaks with an accent.  She is a naturalized citizen of the United States.  She has been employed by the Kansas Department of Health and Environment since 1992.  In October 1997, she began working at a location called Forbes Field in the Office of Information Systems.

In the spring of 1998, she was placed under the supervision of Phil Breedlove, and most of her allegations come from that time.  Plaintiff testified that she often overheard Breedlove make fun of female employees who spoke with accents. Breedlove would gather with other men after teaching a computer class and use a Spanish accent to mock questions that women had asked during the class.  This would often occur close to plaintiff's work station where she could hear the conversation.

Plaintiff said that after trying to ignore this for awhile, she asked Breedlove to stop it.  When that failed to stop the behavior, she approached Breedlove's supervisor, Pam Tierce.  However, nothing was done and the practice continued until plaintiff's desk was moved away from where this was going on.

It is not clear how frequently this had occurred. Plaintiff testified that it would occur at least weekly and sometimes three times in a

single day, depending on the number of classes Breedlove had and the number of foreign born speakers in the classes. Breedlove never attempted to mimic a German accent, nor did he make any remarks about persons of German ancestry. Plaintiff did testify in deposition, however, that Breedlove would sometimes pretend not to understand her accent in order to force her to repeat words that he knew were difficult for her to pronounce.

In February 1999 plaintiff became involved in a "cowboy hat incident." A former high level employee who habitually wore a cowboy hat had retired. One day soon afterward, Tierce and Breedlove saw a cowboy hat at plaintiff's work station with a note on it saying "RIP." They interpreted this as a celebratory note. The suggested inference was that the retired **\*435** supervisor was not popular and other supervisors knew it.

Plaintiff was not at work that day (although the district court indicated that the hat with the note had been at her station for some days by this time) and denied knowing anything about the hat and note. Tierce immediately called and reported the "incident" to a personnel officer. Plaintiff received a letter, which she now contends was a reprimand but which defendant characterized as a letter of concern, from the Secretary of the Department. The letter said that the display was "disrespectful" and had caused "undue disruption to the workplace." The letter was not placed in plaintiff's personnel file.

Plaintiff contended that Breedlove knew that the hat did not belong to her and knew that she was not at work that day. Therefore, she alleged, he had lied to implicate her in the incident. She also contended that she was disproportionately punished over it. The owner of the cowboy hat, a male, and two American-born female receptionists, who in April 1999 had cowboy hats with RIP on them, were not reprimanded at all, Dunlap maintains.

On June 22, 1999, plaintiff Dunlap was delayed by traffic and was late returning from lunch. She put a leave slip in Breedlove's box as a result. She said that he became infuriated about it, for unexplained reasons. However, he approved the leave, which was at his discretion.

Plaintiff also alleged two instances of disparate treatment related to leave or "rearranged time." First, plaintiff testified that her request for leave to care for her seriously ill husband was scrutinized more closely than the request of a male employee whose pet ferret became mortally ill. Plaintiff testified that an American-born male was given two days off either to care for his sick pet ferret or to grieve over the animal's passing, without any question. In contrast, when plaintiff's husband was seriously ill and she requested leave to care for him, she was questioned about the need for it.

The second incident occurred after Tierce became plaintiff's direct supervisor instead of Breedlove, and this incident involves "rearranged time." Although we have not been given a definition of this term, from the context it clearly seems to mean a flexibility in an employee's hours provided for the employee's convenience. Thus, for example, an employee who was an hour late for work because of a dental appointment could, we infer, make up the time by staying one hour later than usual, avoiding the necessity of using accumulated leave for such a minor contingency. One day when Dunlap was late

15

to work because of traffic, she requested "rearranged time" but this was refused by Tierce. In contrast, males "got away with anything they wanted to," according to plaintiff's testimony.

Plaintiff filed her first administrative complaint with the Kansas Human Rights Commission on March 22, 1999. She complained about the mocking of females with accents and that she had been harassed and discriminated against based on her gender and ancestry with regard to the cowboy hat incident. Plaintiff contended in the district court that Breedlove began retaliatory conduct after she filed the charge. She cited the leave slip incident and also said that Breedlove began taking duties away from her. She alleged that he drafted a job description for her that appeared designed to demote her from Office Assistant IV to Office Assistant II. Breedlove made about five requests to have her removed from his supervision.

Plaintiff filed an amended administrative charge on August 19, 1999, adding two instances of allegedly discriminatory treatment **\*436** based on gender and ancestry. The first of these two alleged discriminatory acts is not discussed on appeal. The second was the June 22nd incident described *supra.*

Plaintiff allegedly suffered severe mental distress with accompanying physical symptoms. These include anxiety attacks, depressions, headaches, crying spells, vomiting, shaking and other symptoms. She could not pinpoint the onset of her ailments but said that it got "out of hand" after she received the letter of reprimand about the cowboy hat.

## II

[1] Ms. Dunlap first argues that the district court erred in determining that defendant was entitled to judgment as a matter of law on her claim of a hostile work environment. In evaluating a discrimination claim based on an allegedly hostile work environment, a court must inquire whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult, ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ...' " *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal brackets and quotation marks omitted). Further, we also examine whether the harassment was based on a protected characteristic. Thus we inquire whether the alleged harassment was based on Ms. Dunlap's gender or national origin. *See Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) ( "General harassment if not racial or sexual is not actionable.").

The district judge concluded that the incidents where Breedlove would pretend not to understand Dunlap's accent were the only ones that were based on her national origin or her gender. We agree with the district court that these incidents were insufficient to show an atmosphere of severe or pervasive bias.

Incidents which the judge found not probative of forbidden bias included the handling of the cowboy hat incident, the leave slip incident, and Breedlove's reduction of plaintiff's duties. These, the judge found, and we agree, do not appear related to Ms. Dunlap's gender or national origin. (Although we return to some of these incidents *infra* in discussing plaintiff's claim of disparate treatment.) The district judge also found that the repeated instances of Breedlove mocking other females with Spanish

accents were not gender based. This observation is dubious.

Nevertheless, we agree with the district court that plaintiff's evidence fell short of showing that the offensive conduct was severe or pervasive enough to constitute a hostile environment. We note that in spite of the observation that most of the incidents cited by plaintiff to support her claim were not targeted at her because of her ancestry or gender, the district judge did not ignore the evidence but considered it carefully. In particular, the judge took another look at the evidence of Breedlove's mocking of his female students who had Spanish accents. The judge did not reject this evidence out of hand but observed that "in an appropriate case mimicking of accents could serve as indirect evidence of discrimination...." 211 F.Supp.2d at 1341. But in this case, the judge went on, because the accents being mocked were not similar to plaintiff's, *and* because that conduct was not aimed at her (but merely overheard by her), "the causal link is simply too weak to give rise to an inference that plaintiff's German ancestry or gender was somehow being targeted." *Id.* We agree with this analysis.

In sum, plaintiff's evidence was insufficient to show that she was subjected to a **\*437** work environment of severe or pervasive hostility, and some of the meager evidence she proffered was of questionable relevance because it did not show a connection to her gender or national origin.

### III

[2] On plaintiff's disparate treatment claim, the district judge acknowledged that our circuit has a liberal standard as to what constitutes an adverse employment action, but concluded that plaintiff failed to meet even this low threshold. [FN1] The letter of concern or of reprimand was not enough, the judge found. On that point, the judge cited *Krause v. City of La Crosse,* 246 F.3d 995, 1000 (7th Cir.2001), which held that a reprimand alone is not enough but must be accompanied by a demotion or some other job action. The judge also noted that a similar conclusion had been reached in *Robleado v. Deffenbaugh Indus., Inc.,* 136 F.Supp.2d 1179 (D.Kan.2001), *aff'd,* 33 Fed. Appx. 480 (10th Cir.2002). He found these authorities persuasive and held that because there were no other consequences and the letter was not put in plaintiff's personnel file, the letter did not constitute adverse employment action.

> FN1. To establish a prima facie case of disparate treatment in violation of Title VII in the circumstances of this case, Ms. Dunlap was required to show that she is a member of a protected class by virtue of being female and of German national origin; that she was subjected to an adverse employment action; and that employees who were not members of the protected class or classes were treated more favorably. *See, e.g., Cole v. Ruidoso Mun. Schools,* 43 F.3d 1373, 1380 (10th Cir.1994). The elements of the prima facie case are flexible, depending on the circumstances of the case. *See EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1192- 95 & nn. 6-7 (10th Cir.2000).

The judge found that the allegations of disparate treatment based on denial of plaintiff's requests for leave time and rearranged time failed for the same reason. Being questioned about leave requests and having one request for rearranged time denied

17

are too trivial, he found, noting that other courts have held that transfer and scheduling decisions of more significance than these were insufficient. He cited among other cases *Amro v. Boeing Co.,* 232 F.3d 790, 797 (10th Cir.2000).

As the district judge noted, we liberally define the phrase "adverse employment action." *See, e.g., Hillig v. Rumsfeld,* 381 F.3d 1028, 1031 (10th Cir.2004). As we have applied the term, adverse employment actions "are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand." *Id.* (quoting *Sanchez v. Denver Public Schools,* 164 F.3d 527, 532 (10th Cir.1998)). However, "a mere inconvenience or an alteration of job responsibilities," does not satisfy even our liberal standard. *Sanchez,* 164 F.3d at 532.

We think it quite clear that being questioned about a request for leave is, at least in the circumstances of this case, "a mere inconvenience" that does not constitute an adverse employment action. The same is true for the plaintiff having had to use a trivial amount of leave time on the one occasion that she was denied the convenience of "rearranged time."

The letter of concern is not quite so easily dismissed as a trivial inconvenience. But with our focus on the specifics of this case, and particularly in view of two circumstances--that the letter was not made a part of plaintiff's personnel file and that no allegation (much less showing) is made of adverse consequences following from the incident--we agree with the district **\*438** judge that this did not constitute an adverse employment action.

## IV

[3] The final issue on appeal is whether the district court erred in concluding that plaintiff's retaliation claim was barred by her failure to exhaust administrative remedies. [FN2] We affirm the district court's ruling although we reach our conclusion on different reasoning, basing our holding on *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). As we have previously noted, that case "has effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions." *Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir.2003). Plaintiff's argument in this case is based on our pre-*Morgan* case law which recognized a "narrow exception" to the exhaustion requirement--permitting a claim for incidents not listed in the original administrative charge to be included in the lawsuit if the incidents are "like or reasonably related to the allegations" of the administrative charge. *See Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir.1997). We had also held that "an act committed by an employer in retaliation for filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint." *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir.1994).

> FN2. As noted by the district court, the alleged retaliatory conduct consisted of the incident mentioned *supra* in which Breedlove became angered about plaintiff's submission of a leave slip; Breedlove's reduction of plaintiff's responsibilities; Breedlove's attempt to "silently demote" plaintiff by preparation of a job description reflecting reduced duties; and

Breedlove's requests to have plaintiff placed under another supervisor. 211 F.Supp.2d at 1339. We express no opinion on the merits of these contentions.

As we noted in *Martinez: "Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." 347 F.3d at 1210. [FN3]

FN3. We note that the district judge did not have the benefit of *Martinez* when he issued his opinion.

Plaintiff's argument is simply untenable in the wake of *Morgan.* The incidents which she alleges to have been retaliatory conduct by the employer are discrete incidents of allegedly unlawful employment practices and subject to the requirement of administrative exhaustion, unrelieved by our prior doctrine which excused the exhaustion requirement for acts reasonably related to the acts included in the administrative charge. The judgment is

AFFIRMED.

127 Fed.Appx. 433

END OF DOCUMENT

**112 Fed.Appx. 662**                              This case was not selected for publication in

the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,
Tenth Circuit.
Michael A. MITCHELL, Plaintiff-Appellant,
v.
CITY AND COUNTY OF DENVER, by and through the Board of Water Commissioners;
Joan Funk, in her individual and official capacities, Defendants-Appellees.
**No. 02-1263.**

Oct. 12, 2004.

**Background:** African-American municipal employee sued municipality and his supervisor, in her individual capacity, alleging claims for racial discrimination and racial harassment. The United States District Court for the District of Colorado entered summary judgment in favor of defendants, and employee appealed.

**Holdings:** The Court of Appeals, O'Brien, Circuit Judge, held that:

(1) employee failed to exhaust administrative remedies as to his Title VII hostile work environment claim;

(2) municipality's alleged failure to promote was a discrete act subject to 300-day statutory time limit for filing a Title VII claim;

(3) employee's failure to establish his eligibility for increased pay or sufficient qualification for promotion precluded establishing prima facie Title VII claim for racial discrimination;

(4) supervisor's alleged conduct did not reach the level of a policy or custom of discriminatory employment practices, as was required to establish municipal liability; and

(5) employee failed to establish that municipality's management was deliberately indifferent to his complaints.
Affirmed.

West Headnotes

**[1] Civil Rights** ☞1516
78k1516 Most Cited Cases
Claims.
Investigation of African-American municipal employee's Equal Employment Opportunity Commission (EEOC) charge, which asserted claim for racial retaliation arising from failure to promote could not reasonably have been expected to lead to a hostile work environment claim and, consequently, employee's Title VII hostile work environment claim would be dismissed for failure to exhaust administrative remedies. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** ☞1505(7)
78k1505(7) Most Cited Cases
Municipality's alleged failure to promote African-American municipal employee was a discrete act, rather than a continuing violation, subject to the 300-day statutory time limit for filing a Title VII claim. Civil Rights Act of 1964, §
706(e)(1), as amended, 42 U.S.C.A. § 2000e-5(e)(1); West's C.R.S.A. § 24- 34-301.

**[3] Civil Rights** ☞1141
78k1141 Most Cited Cases
African-American municipal employee's failure to establish his eligibility for increased pay or sufficient qualification for promotion, under municipality's civil service system of

20

promotion and pay increases, precluded his establishing a prima facie Title VII claim for racial discrimination, even though employee belonged to a protected class, and positions were filled with Caucasian inspectors who received promotions sooner than he did.  Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights** ⟲**1383**
78k1383 Most Cited Cases
African-American municipal employee disparate treatment claim under § 1981 was subject to a four-year statute of limitations, while a two-year statute of limitations applied to his § 1983 claim.  28 U.S.C.A. § 1658; 42 U.S.C.A. §§ 1981, 1983; West's C.R.S.A. § 13-80-102(1)(I).

**[5] Civil Rights** ⟲**1351(5)**
78k1351(5) Most Cited Cases
Supervisor's alleged conduct toward two African-American municipal employees over seven years did not reach the level of a policy or custom of discriminatory employment practices at municipal agency, as was required to establish municipality's liability for alleged disparate treatment and racial harassment/hostile work environment; although employee alleged supervisor made four racial comments to the other African-American employee, caused delay in filing his paperwork for a training session, reported employees for driving violations, and gave employees unfavorable assignments, he did not claim municipality had an official written policy of racism.  42 U.S.C.A. §§ 1981, 1983.

**[6] Civil Rights** ⟲**1352(5)**
78k1352(5) Most Cited Cases
African-American municipal employee failed to establish that municipality's management

was deliberately indifferent to his complaints, which he claimed was factual basis for establishing municipality's liability for alleged disparate treatment and racial harassment/hostile work environment; municipality's policies provide procedures for employee complaints about prohibited discriminatory conduct, employee delayed filing an internal complaint under these policies and, once he did, municipality conducted an investigation including interviews with employee, supervisors, and co-workers.  2 U.S.C.A.
§§ 1981, 1983.

**\*664**  Richard C. Lafond, Charlotte N. Sweeney, Lafond & Sweeney, Denver, CO, for Plaintiff-Appellant.

Anne Avery, Carolynne C. White, Denver Water Department, Gail J. Rosenschein, Denver, CO, for Defendants-Appellees.

Before EBEL, PORFILIO, and O'BRIEN, Circuit Judges.

### ORDER AND JUDGMENT [FN*]

> FN* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

O'BRIEN, Circuit Judge.

Michael Mitchell, an African-American, claims the City and County of Denver, through its Denver Board of Water Commissioners (Denver Water) engaged in racial

discrimination and harassment in violation of 42 U.S.C. §§ 1981 and 1983 (equal protection) and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* [FN1] Mitchell appeals the district court's grant of summary judgment in favor Denver Water on his claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

> FN1. Mitchell's complaint also included claims of retaliation in violation of Title VII, breach of contract, and breach of an express covenant of good faith and fair dealing. He does not appeal the district court's summary judgment disposition of those claims.

## I. BACKGROUND

Mitchell began work at Denver Water in 1973 as a laborer and transferred to the Engineering Department in 1987. At the time of this lawsuit, he was a Construction Inspector II--Step 7, overseeing construction contractors on Denver Water's projects. Of Denver Water's nine construction inspectors, two were African-American: Mitchell and James Phillips. The construction inspectors reported to any of four resident engineers depending on the project, but each inspector was assigned one of the resident engineers as a direct supervisor. The resident engineers were supervised by Joan Funk, who in turn, reported to construction manager, James Batt, who reported to the director of engineering, Jon Diebel.

Generally, Mitchell alleges, between 1991 and 1998, Caucasian inspectors received promotions more quickly and were given more favorable assignments than he. He also alleges he was subjected racial epithets because he is African-American. Specifically, Mitchell points to the actions of his second-tier supervisor, Funk, as the significant source of his complaints.

### A. General Discriminatory Actions

Mitchell contends Funk treated him in a manner distinct from the way she related to other employees and her treatment interfered with his work. He claims, on a number of occasions, she improperly communicated directly with contractors on his projects thereby undermining his authority with the contractors and detrimentally excluding him from information important to his job functions. He also claims, in the earlier part of her tenure as his secondary supervisor, Funk harassed him by contacting him directly on work issues, rather than going through his supervisor. Later, she was sometimes rude to him and gave him the silent treatment.

Mitchell also alleges that between 1991 and 1993, Funk assigned him to difficult projects in an effort to see him fail. However, beginning around 1994, he claims **\*665** Funk began assigning him less favorable jobs compared to those assigned Caucasian inspectors, describing them as smaller, low-value projects, offering fewer learning experiences and less training. [FN2] In 1997 and 1998, he asserts she unexpectedly and without justification pulled him off large, favorable jobs and replaced him with a Caucasian inspector. He also alleges Funk interfered with his training opportunities in early 1996, when she delayed the paperwork needed for a training program, even though the delay did not prevent Mitchell from attending the training.

> FN2. Mitchell alleges Phillips also was assigned to less favorable jobs.

In a more miscellaneous vent, Mitchell claims in April 1994, Funk imposed parking restrictions at a location where he and Phillips parked. And, she fabricated stories about him speeding and driving erratically in a company vehicle in 1994, 1996 and 1997.

## B. Racial Statements

Mitchell also contends Funk made racial statements, but the factual basis for his claim is less than clear. He claims a co-worker relayed to him that Funk told his co-workers, "[t]hat nigger isn't going anywhere as long as he is under me," (R. Vol. 11 at 336) and "[t]hat nigger's not going to get anywhere as long as I'm his boss," once referencing Phillips and once Mitchell. (R. Vol. 3 at 735.) He alleges the Phillips reference occurred in 1992 or 1993, and the statement directed toward him in 1994 or 1995. However, there is no testimony from anyone who heard these statements directly, and those who are alleged to have heard them could not recall the incident. Also, in 1994 or 1995, Mitchell claims Funk told Kenneth Lochner, Mitchell's supervisor at the time, that "blacks always feel like they should be promoted ahead of others." He further alleges, during 1997, she told a racially inappropriate joke and, at some time during the same project, commented that black men were not the only men with "big ones," referencing her boyfriend's penis. Edward Sandoval, Mitchell's co-worker, stated he heard Funk say, "[t]hese niggers act like they don't have to do nothing around here" in the maintenance garage. (R. Vol. 3, 896.) However, the alleged recipient of the comment denied Funk made the statement.

## C. Performance Evaluations

Mitchell also charges Funk detrimentally interfered with his performance evaluations in 1994 and 1996. He claims she changed his supervisor's comments in the 1994 evaluation for no reason. He admits, however, she did not change the overall performance rating of "good." In the 1996 evaluation, he complains she impermissibly solicited input from two design engineers, rather than relying solely on input from his supervisor.

## D. Filing of Administrative Charge and Lawsuit

On September 4, 1996, Mitchell filed an administrative charge against Denver Water with the Colorado Civil Rights Division (CCRD) and the Equal Employment Opportunity Commission (EEOC), alleging racial discrimination for failure to be promoted to "Inspector II-Step 9" (and receive the associated pay raise). On September 8, 1997, after obtaining a right-to-sue notice, [FN3] Mitchell filed a lawsuit in federal district court against Denver Water and Funk, in her individual capacity, alleging **666** racial discrimination (disparate treatment) and racial harassment (hostile work environment) under Title VII, §§ 1981 and 1983, and denial of equal protection under § 1983. The district court consolidated Mitchell's case with a related case brought by Phillips. [FN4] On June 14, 2001, the district court granted summary judgment in favor of Denver Water on all of Mitchell's claims except his § 1981 racial discrimination claim. Applying a four-year statute of limitations to his § 1981 racial discrimination claim, the district court found he presented evidence of pretext sufficient to survive summary judgment. On reconsideration, in light of a recent unpublished Tenth Circuit decision holding a two-year limitation period applied to the §

1981 claim, the district court found insufficient facts to establish his claim within the two-year time frame and reversed that portion of its earlier holding, thus disposing of all Mitchell's claims. This appeal followed. [FN5]

FN3. A right-to-sue notice is required to show "final agency action and exhaustion of administrative remedies and proceedings...." Colo.Rev.Stat. § 24-34-306(15) (2002).

FN4. On June 14, 2001, Phillips' § 1981 and Title VII claims survived summary judgment. On reconsideration, the district court dismissed Phillips's § 1981 claim, leaving only his Title VII claim. Although Phillips is not a party to this appeal, Mitchell relies on some of Phillips's allegations to establish a culture of discrimination at Denver Water.

FN5. In his reply brief, Mitchell argues the district court erred in determining Funk was entitled to qualified immunity. Because he did not discuss the qualified immunity issue in his opening brief, he has waived that argument. *State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994). Consequently, the only remaining defendant is the City and County of Denver, through Denver Water.

## II. DISCUSSION

We review *de novo* a grant of summary judgment. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir.1999). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir.1997). Once the movant demonstrates no genuine issue of material fact, the nonmovant is given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas, Dep't of Soc. & Rehab. Servs.,* 147 F.3d 1220, 1228 (10th Cir.1998) (quotation omitted). Unsupported conclusory allegations, however, do not create an issue of fact. *Salehpoor v. Shahinpoor,* 358 F.3d 782, 789 (10th Cir.2004), *cert. denied,* --- U.S. ----, 125 S.Ct. 47, 160 L.Ed.2d 16 (2004).

## A. Title VII Claims

### 1. *Jurisdiction*

[1] Initially, we must determine whether Mitchell's Title VII hostile work environment claim is properly before us. "A plaintiff must exhaust his administrative remedies before bringing suit under Title VII[.]" *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1409 (10th Cir.1997). Requiring exhaustion of administrative remedies "serves to put an employer on notice of a violation prior to the commencement of judicial proceedings. This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation." *Martinez v. Potter,* 347 F.3d 1208, 1211 (10th Cir.2003). A failure to file an administrative Title VII claim before bringing suit is jurisdictionally fatal. *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir.1997). [FN6]

FN6. The jurisdictional issue was not specifically raised below. Rather the parties incorporated these arguments into their discussion of the statute of limitations. Thus, the district court did not separately rule on Mitchell's exhaustion of administrative remedies as a jurisdictional question. The district court did, however, rule that Mitchell's allegations regarding his job assignments were not sufficiently related to the allegations in his EEOC claim, and therefore the job assignment allegations would not be considered.

**\*667** "[W]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Martinez,* 347 F.3d at 1210 (quoting *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir.1994)). A claim is considered "reasonably related" when "the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made." *Deravin v. Kerik,* 335 F.3d 195, 200-01 (2d Cir.2003) (quotation omitted). This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel. *Id.* at 201. Thus, precise pleading is not required for Title VII purposes. *Id.* at 202. Mitchell contends his EEOC filing can be fairly construed to include a hostile work environment/racial harassment claim, and therefore, all allegations in his civil suit are deemed included in his administrative charge.

Consequently, the district court should have considered all of his allegations in determining his Title VII claim. We disagree.

To determine whether the hostile work environment claim is reasonably related to the administrative charge, we look first to the language of the charge itself. The form for filing a Title VII claim is submitted jointly to the CCRD and the EEOC. The form contains several sections with boxes that may be checked or blanks that may be filled in by the complainant. In the section titled "Cause of Discrimination," Mitchell checked the boxes marked "race" and "retaliation." (R. Vol. 5 at 1334.) In the section titled "Date of Discrimination," he checked the box marked "continuing action." (*Id.*) However, in that same section, he filled in the blanks marked "earliest date" of discrimination and the "latest date" of discrimination with the same date, September 4,1996. (*Id.*) In the section provided for his statement of "Personal Harm," Mitchell stated: "on or about August 4, 1996, and continuing" Denver Water "fail[ed] to promote me ... because of my race/African American ... and in retaliation for engaging in protected activity." (*Id.*) He supported this claim in his "Discrimination Statement," alleging: (1) he had always been a "satisfactory to above-satisfactory" employee, (2) three Caucasian males with less seniority and experience had been promoted in the last six months, (3) throughout this period he had consistently complained to his superiors regarding what he perceived to be discriminatory treatment, (4) he had filed a previous charge of discrimination around 1986, (5) Funk allegedly stated, "this nigger [Mitchell] ain't going anywhere as long as he works for me," and (6) he remained employed "at a lesser step than he should be." (*Id.* at 1334-35.) Finally, he requested relief in the

25

form of a promotion to Inspector II-Step 9, back pay and benefits, and compensatory and punitive damages.

Reading Mitchell's EEOC charge liberally, we must conclude the investigation of his "failure to promote" claim could not reasonably be expected to lead to a hostile work environment/racial harassment claim. This is not a case where Mitchell simply neglected to attach a legal label to his **668** underlying factual allegations. *See, e.g., Deravin,* 335 F.3d at 202 (absence of an explicit reference to race discrimination in EEOC complaint is not dispositive). Nothing in Mitchell's EEOC complaint indicates a hostile work environment.

To lay a factual foundation for a hostile work environment claim, Mitchell must allege facts indicating a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998) (quotation omitted). Mitchell's EEOC charge contains no factual allegations of treatment in manner or degree sufficient to allege a hostile work environment. Consequently, Mitchell's Title VII hostile work environment claim (titled "racial harassment" in his civil complaint) is dismissed for failure to exhaust administrative remedies. As a result, we consider only his Title VII racial discrimination/failure-to-promote claim.

## 2. *Statute of Limitations*

[2] Under Title VII, in states that have a state agency to review employment claims such as Colorado, charges must be filed with the state agency within 300 days following the alleged discriminatory acts. 42 U.S.C. §

2000e-5(e)(1); Colo.Rev.Stat. §§ 24-34-301 *et seq.* Because Mitchell's allegations ranged from 1991 through 1998, the district court was required to determine whether the alleged acts were discrete violations within the 300-day time frame, or whether the allegations as a whole constituted a "continuing violation" of unfair employment practices. To do so, the district court applied the analysis set forth in *Purrington v. University of Utah,* considering: (1) whether the alleged acts involve the same type of violation; (2) whether the acts were recurring versus isolated; and (3) whether the acts have the degree of permanence which should alert the employee to the duty to assert his rights. 996 F.2d 1025, 1028 (10th Cir.1993). Under this analysis, the district court concluded Mitchell had not shown the acts alleged prior to the Title VII limitation period were sufficiently related to create a continuing violation. Thus, even though Mitchell's complaint refers to activity going back to 1991, the district court considered only those acts that occurred within the 300 days prior to the filing of his administrative charge, November 9, 1995, to September 4, 1996.

Mitchell argues the Supreme Court's holding in *National R.R. Passenger Corp. v. Morgan,* decided after the district court's decision in this case, substantially abrogates the continuing violation doctrine, thus negating the *Purrington* analysis and requiring consideration of each of his allegations. 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). While we agree *Morgan* has changed the Title VII landscape, it does not change the result for Mitchell.

As we recently observed in *Martinez v. Potter:*

26

[*Morgan*] effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions.... [U]nexhausted claims involving discrete employment actions are no longer viable. *Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted. Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination **\*669** and each retaliatory adverse employment decision constitutes a separate actionable unlawful "employment practice."

347 F.3d 1208, 1210 (10th Cir.2003) (citations and quotations omitted). However, should a Title VII claim allege a hostile work environment, "a court may, for purposes of determining liability, review all such conduct, including those acts that occur outside the filing period." *Morgan,* 536 U.S. at 116. This is because a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. *Id.* Here, however, Mitchell's failure to exhaust his administrative remedies precludes his hostile environment claim. What remains is his claim of discrimination based on Denver Water's failure to promote him. A failure to promote is a discrete act subject to the 300-day statutory time limit for filing a claim. Accordingly, we affirm the district court's decision to limit its consideration to conduct alleged between November 9, 1995, through September 4, 1996. [FN7]

FN7. Because Mitchell's hostile work environment claim could not pass jurisdictional muster, consideration of Mitchell's post-charge allegations is also precluded. The rule enunciated in *Morgan* "is equally applicable ... to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint." *Martinez,* 347 F.3d at 1210-11. Consequently, claims based on activity alleged after the administrative charge was filed will not be considered for the purposes of Mitchell's Title VII claims.

### 3. *Failure to Promote*

[3] In his EEOC charge, Mitchell alleged Denver Water failed to promote him or give him an accelerated pay increase because of his race.

Under the familiar three-step allocation of burdens of proof mandated by *McDonnell Douglas,* a plaintiff alleging a failure-to-promote claim must initially establish a prima facie case, demonstrating that: (1)[h]e was a member of a protected class; (2)[h]e applied for and was qualified for the position; (3) despite being qualified [h]e was rejected; and (4) after [h]e was rejected, the position was filled. If the plaintiff carries [his] burden of establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. This shifts the burden back to the plaintiff to proffer evidence that the employer's reason is pretextual.

*Jones v. Barnhart,* 349 F.3d 1260, 1266 (10th Cir.2003) (citations omitted).

While Mitchell belongs to a protected class and positions were filled with Caucasian inspectors who received promotions sooner

than he did, Denver Water claims Mitchell cannot demonstrate he was qualified for the promotion to Inspector II-Step 9 under its civil service system of promotion and pay increases. We agree.

Denver Water's pay and promotion policies provide that the job classification of Inspector II has nine steps, each representing a five percent pay increase. Employees can progress from step to step and obtain pay raises if their performance meets a satisfactory level. A specific time is associated with step progression: one year between steps one through five, two years between steps five through seven, and three years between seven through nine. Employees cannot skip steps for quicker promotion and raises, but may obtain an "accelerated step" increase. An accelerated step increase is confined to employees who have worked fifty percent of the time required for promotion and have "an overall minimum annual rating of 'Frequently Exceeds Expectations' " for Steps 1-8. (R. Vol. I at 199.) An increase **\*670** to Step 9, therefore, requires two consecutive years of an overall rating of "Consistently Exceeds Expectations," or three consecutive years of "Frequently Exceeds Expectations." (*Id.*)

Between 1991 and 1996, Mitchell received an overall "good" performance review, and was promoted from Step 6 to Step 7 in 1996. Even assuming his ratings improved to "Frequently Exceeds Expectations" for every subsequent evaluation, he could not progress from Step 7 to Step 8 until 1998, at least a year and a half later, and could not reach Step 9 until 2001. Accordingly, Mitchell failed to establish his eligibility for increased pay or sufficient qualification for the Step 9 position.

## B. Claims Under 42 U.S.C. § 1981, 42 U.S.C. § 1983 and Equal Protection. [FN8]

> FN8. 42 U.S.C. § 1981 provides, in relevant part:
> (a) All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....
> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
> 42 U.S.C. § 1983 provides:
> Every person who, under color of any ... custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

Mitchell claims Denver Water engaged in two types of discrimination in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983 and the Equal Protection Clause: (1) racial discrimination/disparate treatment and (2) racial harassment/hostile work environment. These claims are not subject to the exhaustion of remedies requirement found in Title VII. Therefore, his remaining claims are properly before us.

1. *Disparate Treatment*

[4] A claim of disparate treatment encompasses "a situation where the employer simply treats some people less favorably than others because of their race, color, religion or national origin." *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991) (quotation omitted). The elements of a prima facie case are the same whether the claim is brought under Title VII, § 1981 or § 1983. *Id.* at 1162. To establish a prima facie case of racial discrimination under § 1981 Mitchell must demonstrate (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) similarly situated employees were treated differently. *Trujillo v. Univ. of Colo. Health Sci. Ctr.,* 157 F.3d 1211, 1215 (10th Cir.1998). Mitchell's disparate treatment claim under § 1981 is subject to a four year statute of limitations. [FN9] *Harris,* 300 F.3d at 1193. Consequently, we consider the conduct alleged between September 8, 1993, and September 8, 1997, the date Mitchell filed his initial complaint. A two-year statute of limitations applies to Mitchell's § 1983 claim. *See Riel v. Reed,* 760 F.Supp. 852, 854 (D.Colo.1991) ("Actions under 42 **\*671** U.S.C. § 1983 are governed by Colorado's residual statute of limitations, Colo.Rev.Stat. § 13-80- 102(1)(I) (1987).") [FN10] Because our analysis of disparate treatment is the same under § 1981 and § 1983, rejection of Mitchell's claim under § 1981's four year statute of limitations necessitates the failure of Mitchell's § 1983 claim as well. Even assuming Mitchell demonstrated the prima facie case described above, he has failed to establish another necessary element of his claims against Denver Water--municipal liability. As discussed below, the absence of municipal liability defeats his disparate treatment claims.

FN9. At the time the district court considered the appropriate statute of limitations for Mitchell's § 1981 claims, there was conflicting authority as to whether a two or four year limitations period applied. Pursuant to our decision in *Harris v. Allstate Ins. Co.,* 300 F.3d 1183, 1188-89 (10th Cir.2002), that controversy is laid to rest. The two year period applies to claims under § 1981(a), while the four year statute of limitations, 28 U.S.C. § 1658, applies to claims falling under § 1981(b)-the source of Mitchell's claim.

FN10. Mitchell's equal protection claim against Denver Water is subsumed within his § 1983 claims. *Starrett v. Wadley,* 876 F.2d 808, 814 (10th Cir.1989).

### 2. *Hostile Work Environment*

Under § 1981, a prima facie case of racial harassment/hostile work environment requires Mitchell to show, "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (internal citations omitted). [FN11] He must demonstrate "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 923 (10th Cir.2001) (internal quotations and citations omitted). We review all of Mitchell's allegations, both prior and subsequent to the claim, as he has alleged at least one act contributing to that hostile

environment within the statutory time period. *Morgan,* 536 U.S. at 117-18. Again, however, the success of his hostile work environment claims against Denver Water depends on his ability to establish municipal liability. Considering all his allegations in the light most favorable to his cause, he has failed to do so.

> FN11. Although it is well-established that sexual or racial harassment can be actionable under § 1983, *see Woodward v. City of Worland,* 977 F.2d 1392, 1397 (10th Cir.1992); *Ryan v. City of Shawnee,* 13 F.3d 345, 349-50 (10th Cir.1993), it is not clear what constitutes a § 1983 hostile work environment. *See Stepp v. Proctor,* 13 F.3d 407, 1993 WL 498172 (10th Cir.1993) (unpublished opinion). This Court need not determine whether the Title VII standards apply or if the record supports Mitchell's claims under a standard peculiar to § 1983 because Mitchell fails to establish municipal liability.

### 3. *Municipal Liability*

In *Monell v. New York City Department of Social Services,* the Supreme Court held that municipalities can be sued as "persons" under 42 U.S.C. § 1983. 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, the Court held that municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory for merely employing a tortfeasor. *Id.* at 691. Rather, municipalities are subject to liability only for their *official* policies or customs. *Id.* at 694. In *Randle v. City of Aurora,* we applied *Monell* to actions brought under 42 U.S.C. § 1981 as well as § 1983 claims. 69 F.3d 441, 446 n. 6 (10th Cir.1995) (all references to § 1983 liability with regard to the issues of custom and policy

also address the question of whether the City of Aurora can be held liable under § 1981).

[5] Because Denver Water is a municipal agency, Mitchell must also demonstrate the discrimination was caused by a custom or policy within the meaning of ***672** Monell. Id.* at 446. In the instant case, Mitchell does not claim Denver Water had an official written policy of racism. Instead, he argues Denver Water is liable for Funk's actions because she was acting pursuant to a custom of discriminatory employment practices.

A custom is a "persistent and widespread" practice which "constitutes the standard operating procedure of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (quotation omitted). [FN12] It may also be a series of decisions by a subordinate official of which the supervisor must have been aware. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality). Liability attaches in such a case, because "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id.* "But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority." *Id.*

> FN12. Mitchell does not argue that Funk had sufficient policy-making authority to establish municipal liability.

The district court determined Mitchell failed to show a widespread custom of discrimination because his complaints were internally

investigated, "the length of time over which Plaintiffs' allegations took place and the number of individuals employed by Denver Water." (R. Vol. 5, Doc. 16 at 14.) On reconsideration, the district court again rejected Mitchell's claims of municipal liability, finding Phillips' allegations were "not sufficiently similar" to Mitchell's to demonstrate a widespread policy and "the highly particularized allegations of misconduct, isolated and sporadic acts of discrimination [were] directed at specific individuals." (R. Vol. 5, doc. 21 at 5-6.)

Relying on *Melton v. City of Oklahoma City,* Mitchell argues the district court erred because Phillips' allegations were sufficient to establish a question of fact as to whether racial discrimination was a custom at Denver Water. 879 F.2d 706, 725 n. 26 (10th Cir.1989), *rev'd in part on other grounds,* 928 F.2d 920 (10th Cir.1991). That footnote contains a suggestion that when others experience the same retaliation for the same act, such a coincidence might suggest a pattern or practice, but of real significance was the city's litigation posture. Melton, a police officer, was fired for exercising his First Amendment rights; he gave what he believed to be exculpatory information to defense counsel and testified at trial. *Id.* at 711-12. The city conceded the policy issue, so we concluded "the firing was done pursuant to a 'municipal policy' which was ratified by the 'final policymaking authority.' " *Id.* at 725. The *Melton* dicta is not controlling, but if it were, the Phillips allegations, taken as a whole, are insufficient to forestall summary lovemaking

As we observed in *Melton*, "[t]he touchstone for determining official policy is distinguish[ing] acts of the *municipality* from acts of *employees* of the municipality, and

thereby mak[ing] clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 723 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479-80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). The acts complained of here center on one person, Funk, and her treatment of two employees over seven years. During that time she allegedly made four racial comments to someone other than Mitchell, caused delay **\*673** in filing his paperwork for a training session and required Phillips to take a late flight to a training session, twice reported Mitchell and once reported Phillips for a driving violation, and on several occasions gave Mitchell and Phillips unfavorable assignments. While we do not condone Funk's alleged conduct, it does not reach the level of a policy or custom at Denver Water.

[6] Mitchell also argues the district court erred because he has alleged a municipal failure to act or train, and he demonstrated "the agency acted with deliberate indifference to the rights of those affected." (Appellant's Br. at 42.) Mitchell claims both he and Phillips complained to supervisors about Funk's treatment, but Denver Water never meaningfully investigated their grievances. We disagree.

Denver Water's policies provide procedures for employee complaints about prohibited discriminatory conduct. Mitchell did not file an internal complaint under these policies until 1996, [FN13] when he spoke with Ted Williams, the EEO Officer. Williams conducted an investigation including interviews with Mitchell, Funk, supervisors and co-workers. Although two of Mitchell's supervisors reported they thought Funk treated Mitchell unfairly, neither supervisor could give a specific example. He ultimately

determined there was no discrimination. Careful review of the record reveals no indication that the management at Denver Water was deliberately indifferent to Mitchell's complaints. *See Murrell v. School Dist. No. 1,* 186 F.3d 1238, 1249-50 (10th Cir.1999) (acts of sexual harassment by a student directed solely at another student do not demonstrate a custom or policy of the school district to be deliberately indifferent to sexual harassment as a general matter).

> FN13. It appears Phillips complained to Jon Diebel, Funk's secondary supervisor, some time in 1994 regarding Funk's transfer of Phillips to another job and a driving violation. In response, Diebel interviewed the four resident engineers and then held a "counseling interview" with Funk wherein they discussed seven complaints made by the resident engineers about her performance. (R. Vol. 2 at 510.) One of the complaints related to two comments "relating negatively to blacks." (*Id.* at 511.) Funk was told "to be more sensitive in how she conducts herself as far as behavior and verbal discussions." (*Id.*) No other action was taken, but her performance was monitored for a period of time.

## III. CONCLUSION

Summary judgment in favor of Denver Water was appropriate on Mitchell's Title VII claims because he failed to exhaust his administrative remedies prior to claiming a hostile work environment and he failed to establish a prima facie case on his Title VII claims of disparate treatment due to his race. Summary judgment was also appropriate on Mitchell's 42 U.S.C. §§ 1981 and 1983 claims in the absence of municipal liability. AFFIRMED.

END OF DOCUMENT