IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-02414-MSK-CBS

JAMES L. CARRERO,

        Plaintiff,

v.

GRAYSON ROBINSON, SHERIFF OF ARAPAHOE COUNTY, in his official capacity,

        Defendant.

---

## OPINION AND ORDER GRANTING, IN PART, MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Summary Judgment **(# 76)**, the Plaintiff's response **(# 92)**, and the Defendant's reply **(# 97)**; and the parties' Stipulation **(# 94),** withdrawing, in part, the Plaintiff's Motion to Exclude Testimony **(# 66)** by the Defendant's expert.

## FACTS[1]

The Plaintiff, who is of Hispanic national origin, was hired by the Arapahoe County Sheriff's Office in 1986. His Complaint **(# 1)** recites a litany of grievances relating to his employment dating back to 1988, but the Court has previously ruled **(# 27)** that the longest

---

[1]The recitation herein is derived from the representations in the parties' summary judgment motion and response. As discussed more fully herein, many of these statements are not supported by citation to the record, and, as such, are not properly before the Court. The Court recites such unsupported assertions in this section only for purposes of establishing the context of the dispute, and addresses the sufficiency of the actual evidence in the record in detail in the Analysis section.

statute of limitations applicable to his various claims operates to exclude events occurring more than four years prior to his November 29, 2005 Complaint.  In other words, only those events occurring on or after November 29, 2001 are actionable under any of the claims asserted by the Plaintiff, and the Court will focus its factual recitation on those events.

As of November 29, 2001, the Plaintiff was assigned to the Arapahoe County Jail.  The centerpiece[2] of the Plaintiff's complaint arises from a series of events that began in July 2003.  At that time, the Sheriff's Department commenced an internal investigation of the Plaintiff based on a complaint from a jail visitor whom the Plaintiff had refused authorization to enter on the grounds that the visitor lacked sufficient identification.  In September 2003, the Plaintiff was suspended, and on September 30, 2003, was advised that his employment was being terminated as a result of the incident.  (The Plaintiff contends that the reason for his termination was later changed to the accusation that he was spreading rumors about the Defendant having physically assaulted an ex-girlfriend.)  The Plaintiff filed a charge of discrimination with the EEOC in December 2003, and on January 12, 2004, the Sheriff's Department decided to reduce the termination to a demotion, and reassigned the Plaintiff to the jail.  The Plaintiff contends that the demotion was designed to humiliate him, in that he was forced to receive training from employees he had previously supervised and trained.  He also contends that the jail assignment was unsafe, in that he was now required to work on the jail floor with inmates whom he had previously been responsible for disciplining.   On March 10, 2004, fearing for his safety, the Plaintiff resigned his employment.

The Plaintiff commenced this action, alleging three claims for relief: (i) a claim pursuant to 42 U.S.C. § 1983, in that the Plaintiff was retaliated against for exercising his First Amendment

---

[2]The Court will address other factual contentions in more detail in the analysis herein.

rights to speak on matters of public concern; (ii) race discrimination in violation of 42 U.S.C. § 1981, in that the Defendant deprived the Plaintiff of "equal employment opportunity and contractual benefits" because of his national origin, that he suffered harassment as a result of his national origin, and that he was retaliated against for complaining of discrimination; and (iii) violations of Title VII, 42 U.S.C. § 2000e *et seq.*, in the form of disparate treatment based on national origin, hostile environment harassment, and retaliation.

The Defendant moves (# **76**) for summary judgment on all three claims. Specifically, he argues: (i) with regard to the First Amendment retaliation claim, the Plaintiff cannot establish that he spoke on a matter of public concern, that the Plaintiff's interest in speaking outweighed the Defendant's interest in regulating it, and that the speech was a motivating factor in the employment actions taken against the Plaintiff; (ii) with regard to the § 1981 claim, he cannot establish the existence of an adverse employment action in the form of a constructive discharge to support the disparate treatment portion of the claim, he cannot establish the existence of a hostile environment to support the harassment portion of the claim nor show the existence of a custom or policy of the Defendant permitting such an environment, and he cannot show an adverse employment action or causal connection in support of the retaliation portion of the claim; (iii) that the Plaintiff's Title VII claims fail for the same reasons as his § 1981 claims; and (iv) that the Defendant is entitled to summary judgment on its affirmative defense of the statute of limitations as to some, but not all, of the events cited by the Plaintiff in his Complaint and during discovery.

Separately, the Plaintiff moved (# **66**) to exclude testimony by an expert designated by the Defendant. After discussions, the parties filed a Stipulation (# **94**), purporting to withdraw certain opinions offered by the Defendant's expert, modifying other opinions, and withdrawing the

Plaintiff's motion to exclude the expert testimony, except as to one remaining opinion proffered by the expert.  The Stipulation indicates, somewhat inconsistently, that the parties "will continue to attempt to resolve the differences regarding that opinion," and, at the same time, the Plaintiff was not withdrawing his motion as to that remaining opinion.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law determines what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(e).

Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is no genuine dispute as to any material fact, no trial is required because the court applies the law to the undisputed facts and enters judgment. If there is a genuine dispute as to material fact, a trial is required.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. First Amendment claim**

1. Legal standards

In analyzing a public employee's claim that he was retaliated against for exercising First Amendment rights, the Court must first examine whether the speech at issue touches on a matter of public concern; if it does, the Court proceeds to ask whether the employee's interest in commenting on the issue outweighs the interest of the employer in preventing disruption of the employer's operations. *Casey v. West Las Vegas Independent School Dist.*, 473 F.3d 1323, 1327-28 (10th Cir. 2007). If the Plaintiff makes an adequate showing on both questions, he must then show that the speech was a substantial or motivating factor in an adverse action taken against him, and the employer then has the burden of showing that it would have taken the same action

5

even in absence of the employee's speech. *Deschenie v. Board of Education*, 473 F.3d 1271, 1276 (10th Cir. 2007).

In deciding whether a public employee's speech touches on a matter of public concern, the Court must examine the content, form, and context of the employee's speech. *Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005). Where First Amendment retaliation cases arise in the context of public employment, an additional issue complicates the analysis. In such circumstances, the critical question is whether the speech at issue was made in furtherance of the employee's official duties. Employees are not protected against retaliation based on speech that is part and parcel of their job responsibilities. *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958-59 (2006). The Plaintiff bears the burden of showing that his statements were made in his capacity as a citizen, and not as part of his official duties. *Casey*, 473 F.3d at 1328. The 10th Circuit has suggested that the proper analysis of whether speech arises from an employee's job responsibilities starts with a determination of the content of the particular speech at issue, followed by an analysis of the scope of the employee's designated job duties, and then an assessment as to whether the speech at issue is either "explicitly required" as part of the employee's job or stems from the types of activities the employee is paid to do. *Green v. Board of County Commissioners*, 472 F.3d 794, 800-02 (10th Cir. 2007).

The Plaintiff identifies four instances[3] in which he contends he engaged in speech on a matter of public concern: (i) on March 18, 2002, he complained to several officials within the Sheriff's Department that he believed the county jail's practice of assigning inmates to beds by race was inappropriate and offensive; (ii) that, at an unspecified time, the Plaintiff assisted other employees, specifically Deputy Garcia, in filing complaints of discrimination; (iii) that the Plaintiff filed three complaints of discrimination with the EEOC; and (iv) that, at a point in time in which the Defendant was seeking election as Sheriff, the Plaintiff encouraged Deputy Draper to report information about the Defendant's alleged history of domestic violence to the District Attorney. The Court will analyze each of these allegations in turn.

(a).   Complaints regarding inmate segregation

Turning first to the Plaintiff's claim that he was retaliated against for complaining to Sheriff's Department officials about the segregation of inmate beds, the Court first attempts to determine the precise content of the Plaintiff's statement.  The Plaintiff cites to pages 160 and 161

---

[3]The Plaintiff's summary judgment response is unclear as to whether the Plaintiff relies upon more than the four specific instances of speech he describes.  In a footnote, he states that he intends to rely upon "numerous examples of speech deserving of First Amendment protection" as shown in "four pages of deposition testimony" attached to the response as Exhibit 1.  (The Court observes that the Plaintiff cites to these "four pages" as being pages "411-419" of a deposition, a range that appears to encompass eight pages of material.)  The Court has examined Exhibit 1 of the Plaintiff's response, which consists of selected pages of the Plaintiff's own deposition.   The only page in that exhibit that falls within the range identified by the Plaintiff is what appears to be a fragment of page 413, reproducing only five lines of text. *See Docket* # 92-2 at 22.  That text appears to be the end of a question asking the Plaintiff to list "every single statement that you think you said that retaliation was a result of," and the beginning of the Plaintiff's answer that "I'm going to base it on internal affairs investigations that I though were bogus," and a statement that the Plaintiff was "[t]rying to name them off."  Given the lack of specificity in the tendered exhibits, the Court will assume that the Plaintiff relies only upon the four specific instances of speech he actually discusses in the body of his response.

of his deposition as addressing this statement.  The cited portion of the deposition is only an

answer to an unknown question, in which the Plaintiff states:

> A: Just a lot of things.  Just – I mean, you're told to keep quiet
> about the – the things that occurred in the jail, or speaking with the
> white bed and the Mexican beds.  And they they just left that alone,
> thought there was no problem.  Although there was specific
> evidence relating to people writing Mexican bed and white bed.  I
> mean, that was shoved under the carpet.  Nothing was ever done to
> Nancy Sivik or anything else other than a memo being placed that
> you can't do that.  That's been done for years there.

*Docket* # 92-2 at 8.  As is clear from the quoted text, the cited deposition excerpt gives no

indication of what the Plaintiff actually said, to whom, and when.  Because the Plaintiff bears the

burden of establishing that his speech involved a matter of public concern, his failure to point to

evidence demonstrating the "content, form, and context" of his statement*, see Baca*, 398 F.3d at

1218-19, prevents him from carrying his burden on the first element of his claim.

Even assuming that the Court could infer the nature of the statement from this scrap of

deposition testimony, the Plaintiff has failed to show that such a statement falls outside the scope

of his job duties.  In *Green*, the 10th Circuit cited with approval *Freitag v. Ayers*, 468 F.3d 528

(9th Cir. 2006), a case in which a prison guard complained to her supervisors – and later, to

external agencies – about her supervisors' failure to respond to her complaints of being subjected

to harassment from prisoners.  The 9th Circuit held that the guard's internal complaints to her

supervisors were actions within the scope of her job duties, and thus, were not matters of public

concern under *Garcetti*.  468 F.3d at 546.  Similar logic applies here.  Although the record is far

from clear as to the precise chain of command over the Plaintiff and the manner in which he was

expected to report any concerns regarding the actions of other Sheriff's Department employees, it

is clear from his deposition excerpt that he reported of the segregation of inmates to superiors with the intent that the co-workers responsible for those actions would be disciplined.  Even if there are conceivable situations in which such internal complaints would fall outside the scope of an employee's job duties, the Plaintiff has failed to come forward with evidence indicating that this is such a case.  Accordingly, he has failed to show that his statements to Sheriff's Department officials concerning inmate segregation is protected speech for purposes of a First Amendment retaliation claim.

(b).  <u>Assisting Deputy Garcia with filing a charge</u>

Next, the Plaintiff points to a "statement" he made in which he assisted Deputy Garcia in filing a charge of discrimination.  The evidence the Plaintiff points to on this point is a portion of his deposition in which he states "[Deputy Garcia] came to me and asked me some things.  And I told her the proper channels to do it.  I said, 'You've got to file a complaint within the organization, bring it to internal affairs if you feel that you were discriminated against. . .  I said, you need to file a grievance and go through the chain, and she did.'"[4]  It is difficult to imagine how

_____

[4]The cited portion of the Plaintiff's deposition also contains a passage in which the Plaintiff states that Deputy Garcia "revealed to me . . . how Brad Reed and Rich Eucler told her that they felt that I was coaching her about the Mexican thing, and that I coached her to file this complaint."  The Plaintiff does not specifically argue that he was retaliated against because of what Reed and Eucler <u>thought</u> he said to Deputy Garcia, as opposed to what he actually said, but even if he had, the proffered evidence would be insufficient.  Assuming that such hearsay statements by Reed and Eucler could somehow be considered admissible under Fed. R. Evid. 801(d)(2), the statement by Deputy Garcia to the Plaintiff is itself hearsay.  The Plaintiff has not offered a deposition or affidavit by Deputy Garcia attesting to what she heard Reed and Eucler say; he has only offered his recollection of what Deputy Garcia told him they said – a classic example of hearsay.  A party opposing summary judgment is not required to come forward with evidence in a form that would be admissible at trial, but the content or the substance of the evidence presented must be admissible.  *Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).  Thus, "a third-party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill."  *Id.*

the Plaintiff advising Deputy Garcia of "the proper channels" to file a complaint would constitute speech on a matter of public interest (as opposed to Deputy Garcia's private interests), but even if it did, it is clear that this statement was conduct falling within the Plaintiff's job responsibilities. It is not clear from the record whether the Plaintiff had supervisory authority to advise Deputy Garcia, or whether she sought his counsel simply as a trusted co-worker, but in either event, it is logical to assume that every employee's job responsibilities include advising co-workers as to the nature and operation of the employer's policies and procedures. Under these circumstances, the Plaintiff has failed to show that his comments to Deputy Garcia fall outside of *Garcetti* so as to be actionable.

### (c)  Filing of EEOC charges

The Plaintiff also fails to show that his filing of EEOC charges constitutes speech on a matter of public concern. When an employee speaks upon matters only of personal interest, the First Amendment is not implicated. *Connick v. Meyers*, 461 U.S. 138, 147 (1983). Thus, the employee must show that his speech had a broader public purpose beyond merely seeking redress of personal grievances. *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir.1996). In *Finn v. New Mexico*, 249 F.3d 1241, 1248 (10th Cir. 2001), the court rejected the notion that an employee's complaints that he had been discriminated against because of his disability constituted speech on a matter of public concern. A similar conclusion is warranted here. The Plaintiff has not attached copies of his EEOC charges to his summary judgment response, and for that reason alone, the Court could find that he has failed to carry his burden of showing that the charges constitute speech on a matter of public concern. Even if the Court were to independently review the docket in this case to locate copies of the charges, *see Docket* # 7, Ex. 1, 3, 5, a review of those charges

10

reveals that they refer exclusively to complaints by the Plaintiff as to how he was being treated. Like the employee questionnaire found not to constitute protected speech in *Connick*, the Plaintiff's EEOC charges merely reflect that a single employee in the Sheriff's Department is upset with the actions his employer has taken with regard to his job.  461 U.S. at 148.  Thus, the Plaintiff fails to show that his filing of charges constitutes speech on a matter of public concern.

(d)  Urging Deputy Draper to report alleged domestic violence

The sole remaining incident of speech identified by the Plaintiff is an incident in which the Plaintiff discussed with Deputy Draper the issue of whether the Defendant had engaged in acts of domestic violence against a former girlfriend.  The Plaintiff's summary judgment response does not clearly identify the speech at issue here – it cites only to a portion of Draper's deposition in which Draper reports that the Plaintiff was "asking about" such rumors and encouraged Draper to "call him or report [the rumors] to Internal Affairs," as well as to call the District Attorney's office.

In a brief **(# 93)** filed in conjunction with his summary judgment response, the Plaintiff cites to additional, somewhat inconsistent, evidence on this issue.  He cites to Draper's deposition testimony that, in or about March 2002, Draper entered a conversation in which other Sheriff's Department employees were discussing the Defendant running for Sheriff.  During that conversation, someone – Draper is unsure who, but does not believe that it was the Plaintiff – mentioned rumors that the Defendant had physically abused someone in the past and asked Draper what he knew of the situation.  The cited excerpt does not reveal what, if anything, Draper said in response, nor indicate that the Plaintiff made any statement at that time.  The Plaintiff also cites to his own deposition, painting a significantly different picture of that (or perhaps a different)

11

event.  According to the Plaintiff's deposition, Draper approached him and said he was bothered

by the fact that he could not attend parties or ceremonies involving the department because

Draper's fiancee had been beaten by the Defendant when she was previously dating him.  The

Plaintiff testified that he advised Draper to tell his fiancee to go see the District Attorney.  Upon

several days' contemplation, the Plaintiff decided that he might be obligated to report the alleged

abuse as criminal activity, and again contacted Draper and instructed him to "tell somebody"

about the allegation.

Taking this evidence in the light most favorable to the Plaintiff, the Court finds that the

Plaintiff's statements on this issue constitute matters of public concern.  First, the Court assumes,

for purposes of this motion only, that Draper did indeed reveal to the Plaintiff that his fiancee had

been assaulted by the Defendant.[5]  As such, it is clear that such an allegation – that a candidate for

elected office had engaged in criminal conduct involving physical violence – is a matter upon

which the public interest is high.  The Court also takes the Plaintiff's own testimony as true – that

he advised Draper to contact the District Attorney about the conduct Draper revealed to the

Plaintiff.  Upon these facts, the advice the Plaintiff gave to Draper can reasonably be said to be in

furtherance of a public purpose.  In many respects, it is akin to complaints that the prison guard in

*Freitag* made to legislative officials and state agencies about her employment grievances, which

were found to be speech on matters of public concern.  468 F.3d at 545-46.  Both cases involve

an employee bringing (or, in the instant case, encouraging others to bring) important public

---

[5]Needless to say, the Defendant contends that these accusations are false, and indeed, the
Plaintiff has attached portions of the deposition of Draper's fiancee who testified that the
Defendant was "controlling" and "emotionally abusive," but nowhere claims that she was
physically harmed by him.

information to sources outside the sphere of their employment.  The Plaintiff's encouragement to

Draper has no particular connection to his employment,[6] except the fortuitous circumstance that

he came to meet Draper through his work, rather than in some more public forum.  The Plaintiff's

advisement that Draper report an alleged crime to the District Attorney arises as much from the

Plaintiff's responsibility as a citizen as it does from his employment.  Thus, the Court finds that

the Plaintiff has established that his advice to Draper constituted protected speech on a matter of

public concern.

The second element of a First Amendment retaliation claim requires the Plaintiff to show

that the Defendant's interest in maintaining order in the workplace outweighs the Plaintiff's

interests in speaking out.  In examining the balance between these interests, the Court considers

the time, place, and manner of the speech, as well as the context in which the speech arises.

*Weaver v. Chavez*, 458 F.3d 1096, 1099 (10th Cir. 2006).  The Court must also examine the

amount of disruption caused by the Plaintiff's speech – that is, whether the statement impaired

discipline by superiors or harmony among co-workers, whether it has a detrimental impact on

working relationships where loyalty and confidence are necessary, or whether it impedes the

performance of the speaker's duties or interferes with the operation of the enterprise.  *Id.*

---

[6]This is a particularly generous viewing of the evidence tendered by the Plaintiff.  The Plaintiff's own deposition testimony is that the Plaintiff reiterated his encouragement to Draper to report the matter to the District Attorney because the Plaintiff was concerned that his employment conferred upon him an obligation to report the alleged crime.  *See Docket* # 93-3 at 4 ("there are specific policies in the Sheriff's Office that if you're aware of allegations of criminal effect, or if people within the organization are involved in possible criminal activity, you're to report it").  Were the Court not inclined to grant summary judgment to the Defendant on this claim on other grounds, the Court might easily conclude that because the Plaintiff testified that his conditions of employment compelled him to so advise Draper, such speech was within the Plaintiff's job responsibilities and thus, not protected under *Garcetti*.

Although the Plaintiff has the burden of showing that the balance of interests ultimately tips in his favor, the employer has the burden of showing such disruption by pointing to specific evidence. *Id.*

Here, the Defendant has produced significant evidence of actual disruption. Draper testified that he considered the Plaintiff's conversations with him about the issue to be "totally unprofessional" – that "A, it wasn't any of his business and, B, that he wasn't going about it the proper way." *Docket* # 93-2 at 4. When asked if he felt it was "out of line" for the Plaintiff "to follow up with you to find out if these rumors were true or not," Draper answered that it was – that "it's the duty of the Internal Affairs section to investigate . . . not the responsibility or the duties of a jail sergeant to do that." *Id.* at 5. The Defendant has submitted his own affidavit that Brad Reed reported to him that Draper had come to Reed to report that the Plaintiff "was trying to set [Draper] up," and that he wanted a restraining order against the Plaintiff. *Docket* # 77-4 at ¶ 6. The Defendant also submits an affidavit of Randall McCarter, which recites McCarter's conversations with the Plaintiff on the issue. *Docket* # 77-2, 77-2. McCarter reports that the Plaintiff raised the issue on three separate occasions with McCarter during working hours. The Defendant's own affidavit states that, on the basis of all of the foregoing information, he considered the Plaintiff's discussion of the issue to be disruptive, intended to erode the Defendant's authority, and designed to create divisions within the staff. *Docket* # 77-4, ¶ 8.

The Plaintiff does not actively dispute any of these facts. He acknowledges the Defendant's assertion that the Plaintiff's statements were bothering Draper, but does not offer contrary evidence – *i.e.* that Draper welcomed the discussion. Instead, the Plaintiff merely offers the unsupported, conclusory assertion that the Defendant's evidence "is insufficient . . . to show

actual disruption." The Plaintiff states – without citation to authority and in direct contravention of Draper's testimony – that any disruption resulting from the rumors was not attributable to him. Finally, he argues that because rumors were already circulating before the Plaintiff approached Draper, any statements by the Plaintiff could not be the cause of any disruption. *Citing Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir. 1989). This misses the point – the disruption at issue here was caused not only by the discussions of the rumors themselves,[7] but also by the Plaintiff repeatedly confronting Draper – against Draper's wishes – and encouraging him to take the allegations public. Accordingly, the evidence that the Plaintiff's speech was disruptive is undisputed.[8]

The Court then turns to balancing the Plaintiff's interest in speaking against the Defendant's interest in avoiding disruption of the Sheriff's Department's operations. The Court notes that the Plaintiff's interest in speaking is relatively light. Although alleged criminal activity by the Defendant may be a matter of public interest, the Plaintiff did not purport to have firsthand knowledge of any such activity. Rather, according to the Plaintiff, his only speech was encouraging someone else with such knowledge to report it. Moreover, the record reflects that the Plaintiff was not even able to determine the truth of the allegations he was encouraging Draper to report. Even accepting the Plaintiff's testimony that Draper told him his fiancee had been assaulted by the Defendant, McCarter's notes from his conversations with the Plaintiff reveal

---

[7]In fact, the record does not reflect that the circulation of the rumors before the Plaintiff became involved was the cause of any significant disruption. The only evidence in the record of disruption is related to the Plaintiff's involvement in discussing the rumors.

[8]Because there are no disputed issues of fact as to the disruptiveness of the Plaintiff's speech, there is no need for jury factfinding, and the Court can evaluate the second factor as a matter of law. *Weaver*, 458 F.3d at 1101-02.

that the Plaintiff was never able to actually confirm the truth of that representation by speaking to

the fiancee herself.  *See generally Wulf*, 883 F.2d at 858 n. 24 (accuracy of the speech is a factor

to be considered in the balancing of interests).  Thus, while there may be some public interest in

third parties encouraging crime victims to report the perpetrator, that public interest decreases

dramatically when the third party's only knowledge of the crime arises via hearsay, and the

encouragement to the victim is offered indirectly through others.

By contrast, the disruption caused by the Plaintiff was direct and palpable.  It is

undisputed that Draper found the Plaintiff's intercession to be offensive and unprofessional.  The

working relationship between Draper and the Plaintiff was damaged, to the extent that Draper

entertained seeking a restraining order against the Plaintiff.  The Plaintiff's conduct also taxed the

confidence the Defendant had in the Plaintiff, to the point that the Defendant believed that the

Plaintiff was deliberately attempting to undermine the Defendant's authority over the Department.

Moreover, it is clear that the time and place of the Plaintiff's speech was disruptive, occurring at

the office during work hours, rather than off-premises and during the Plaintiff's and Draper's free

time.

Based on the foregoing, the Court finds that, on balance, the disruptive effects on the

workplace of the Plaintiff's speech far outweigh what little public interest there may have been in

the Plaintiff's speech.  Accordingly, the Plaintiff has failed to carry his burden of showing that the

balance of interest tips in his favor on the second element of his First Amendment claim involving

these statements.

The Court having found that the Plaintiff cannot establish the elements of a First Amendment retaliation claim with regard to any of the statements specifically identified in his summary judgment response, the Defendant is entitled to summary judgment on that claim.

### C.  § 1981/Title VII claims

The Plaintiff's remaining claims involve allegations of employment discrimination, harassment, and retaliation, asserted both under 42 U.S.C. § 1981 and Title VII.  The same basic analytical structure is used in evaluating claims arising under both statutes.  *English v. Colorado Dept. of Corrections,* 248 F.3d 1002, 1007-08 (10th Cir. 2001).  However, the statutes have differing periods of limitations.  The Court has already determined **(# 27)** that the Plaintiff's Title VII claims only encompass conduct between March 4, 2003 and the Plaintiff's resignation in March 2004.  The Plaintiff's § 1981 claims have a four-year statute of limitations, *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004), and thus, encompass conduct arising on or after November 29, 2001, four years from the filing of the Complaint.  Accordingly, the Court will apply the same substantive analysis to the claims under both statutes, but will seek to specifically identify the date of each challenged action to determine which statute(s) might apply.

### 1.  Disparate treatment

The Plaintiff claims disparate treatment under both statutes.  These claims are examined under the familiar *McDonnell-Douglas* framework, which requires the Plaintiff to establish a *prima facie* case by showing that: (i) he belongs to a protected class; (ii) he was qualified for his job; (iii) he suffered an adverse employment action; and (iv) such action arose under circumstances giving rise to an inference of discrimination.  *English*, 248 F.3d at 1008.  The Defendant then has the burden of articulating a legitimate, non-discriminatory reason for the

17

adverse action, and the Plaintiff has the ultimate burden of proving that explanation to be a pretext for discrimination. *Id.*

The Defendant contends that the Plaintiff cannot demonstrate the existence of any adverse employment action. In response, the Plaintiff specifically identifies seven actions: (i) that in April 2002, the Plaintiff was "relegated" to the jail as punishment and that his Captain, Tom Bay, told others that he would not be transferred out because he had complained about racial harassment; (ii) that at some unspecified time, an Internal Affairs investigation was launched against the Plaintiff for failing to discourage others from referring to a part of the jail as "Little Mexico"; (iii) that in March 2002, the Defendant was "spying" on the Plaintiff by placing a camera in the Plaintiff's office; (iv) that at an unspecified time, Bay required the Plaintiff to report to work early for his shift without compensation; (v) that in July 2003, an Internal Affairs investigation was launched against the Plaintiff for denying access to a jail visitor, and that as a result, the Plaintiff was demoted and briefly terminated; (vi) that at some point after the July 2003 investigation, the Plaintiff requested a transfer from the jail to a patrol or investigations assignment, or, at a minimum, a transfer to a different jail unit, but such requests were denied; and (vii) that he was constructively discharged. The Court will examine each alleged adverse action in turn.

(i) Denial of April 2002 transfer

In support of his contention that he was "relegated" to the jail in 2002, the Plaintiff cites only to a single passage in his own deposition. In that passage, he is asked about a conversation he had with Bob Lauderdale, who allegedly told the Plaintiff that "your transfer request wouldn't be granted because management was trying to punish you by keeping you at the jail." The Plaintiff responded that those were Lauderdale's exact words, and that another individual, Bay,

18

told the Plaintiff that he "had burned too many bridges [and] can't keep [his] mouth shut."

*Docket* # 92-2 at 20.  Although skeletal, this evidence, taken in the light most favorable to the

Plaintiff, suggests that the Plaintiff had sought a transfer from the jail, and that such a transfer was

denied to him.

However, this alone is insufficient to establish an adverse employment action.  In *Sanchez*

*v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998), the 10th Circuit held that a denial of

an employee's request for a lateral transfer from one assignment to another did not constitute an

adverse employment action.  It noted that the position the employee sought offered substantially

the same benefits and duties as the position she occupied, and thus, a "purely lateral transfer"

would involve no significant changes in her conditions of employment.  *Id.*  It observed that "the

fact that the employee views the transfer either positively or negatively does not of itself render

the denial or receipt of the transfer an adverse employment action."  *Id.*  In *Piercy v. Maketa*, 480

F.3d 1192, 1203 (10th Cir. 2007), the 10th Circuit relied on *Sanchez* to find that a policy

prohibiting a female prison guard from seeking a transfer to another unit of the facility did not

constitute an adverse employment action because the assignment she desired offered similar duties

and responsibilities.  *Id.* at 1203-04.  Thus, even though she subjectively found other assignments

more desirable, the assignments were not substantially different such that the policy prohibiting

her transfer to the more desirable position constituted an adverse employment action.  Taken

together, *Piercy* and *Sanchez* establish that, to constitute an adverse employment action, the

denial of a transfer must be one which prevented the employee from moving to a position with

substantially different duties, compensation, or conditions of employment.  As with all aspects of

19

the *prima facie* case, the burden is on the Plaintiff to show that the transfers he requested and was denied would have substantially altered his duties or compensation.

The scant evidence supplied by the Plaintiff with regard to this alleged adverse action fails to show that the transfer he sought was to a substantially different position.  The deposition excerpt cited by the Plaintiff refers only to a "transfer request," and does not indicate the particular benefits or duties of either the position the Plaintiff presently occupied and the one he sought.  One might infer that Lauderdale's reference to "keeping [the Plaintiff] at the jail" suggests that the transfer he sought was to some position outside the jail, but beyond drawing that inference, one would have to speculate as to what position was at issue and what its duties were. Thus, the only evidence that the denial of the requested transfer was materially adverse was the fact that the Plaintiff desired it.  As *Sanchez* and *Piercy* make clear, the Plaintiff's subjective desire for a transfer to another position is not sufficient to make the denial of such a transfer an adverse employment action.  Because the Plaintiff has failed to come forward with sufficient evidence to show that the April 2002 denial of a transfer was materially adverse, the Defendant is entitled to summary judgment on any disparate treatment claim based on this transfer.

(ii) Internal Affairs investigation regarding "Little Mexico"

The sole evidence cited by the Plaintiff regarding this event is a single passage from his deposition.  The Plaintiff states that, two days after a discussion with Bay, "he initiates an IA on me, where part of the day room was being referred to as Little Mexico." *Docket* # 92-2 at 9. Interpreting this brief bit of testimony in the light most favorable to the Plaintiff, the Court assumes that the Plaintiff is testifying that Bay initiated an Internal Affairs investigation of the

Plaintiff with regard to the fact that someone – the Plaintiff or others – was referring to an area of the jail as "Little Mexico."

The Court cannot say that an investigation alone constitutes an adverse employment action.  In the disparate treatment context, to be adverse, an employment action must be "a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Aquilino v. Univ. of Kansas*, 268 F3d 930, 934 ( 10th Cir. 2001).  Indeed, if an employer investigates an employee and concludes that discipline in the form of a letter of reprimand is appropriate, that reprimand does not constitute an adverse employment action unless it actually affects the likelihood of future discipline or compromises the employee's future employment opportunities.  *Medina v. Income Support Division*, 413 F.3d 1131, 1137 (10th Cir. 2005).  If discipline flowing from an investigation does not necessarily constitute an adverse employment action, it is difficult to see how an investigation itself, with no apparent consequences, can be materially adverse.  In any event, as the Defendant points out, the Plaintiff acknowledged that the investigation into this issue ultimately exonerated the Plaintiff of the allegations.  Given that the investigation did not result in any change to the terms or conditions of the Plaintiff's employment, the Court cannot find that the Plaintiff has carried his burden of showing that this investigation constitutes an adverse employment action.

(iii)  Installation of camera

The Plaintiff points primarily to the deposition testimony of the Defendant on this issue. The Defendant testified that the Plaintiff had made several allegations that unknown individuals had been vandalizing property in the Plaintiff's office.  In order to attempt to identify the

21

perpetrators, the Defendant instructed an individual in the Special Investigations Section to install a video camera in the ceiling of the Plaintiff's office. *Docket # 92-5 at 2-4.* The Plaintiff's own testimony on this subject is extremely brief – he cites only to a single phrase in his testimony that the camera was "targeting me," and that he believed that Bay was "watching me, for whatever reason, just looking for things." *Docket # 92-2 at 10.*

The Plaintiff does not cite caselaw for the proposition that being subjected to increased supervision or monitoring can constitute an adverse employment action. Indeed, there appears to be significant authority to the contrary. *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017 (8th Cir. 1999); *Harris v. Firstar Bank Milwaukee*, 97 Fed.Appx. 662, 665 (7th Cir. 2004) (unpublished); *Signal v. Gonzales*, 430 F.Supp.2d 528, 541 (D.S.C. 2006). In *Poppy v. City of Wiloughby Hills*, 96 Fed.Appx. 292, 295 (6th Cir. 2004) (unpublished), the court found that a variety of actions, including the installation of a security camera in the hall outside an employee's office, were not materially adverse. Nevertheless, even assuming that the Plaintiff <u>could</u> establish that the camera in his office could amount to an adverse employment action, he has not done so. The deposition testimony of the Defendant indicates that the Defendant never reviewed the recordings, if any, made from the camera. The Plaintiff's own testimony mentions that Bay told the Plaintiff that Bay reviewed the footage every day, but does not show that Bay was doing so to monitor the Plaintiff's work activities. At best, the Plaintiff offers only his own subjective belief that Bay was "watching me [and] looking for things." The Plaintiff does not allege that, despite Bay's daily review of the camera footage, Bay ever took action against the Plaintiff for anything the camera revealed. Given that the camera was installed pursuant to complaints by the Plaintiff himself, and that there is no evidence that it was actually used for any purpose other than its

ostensible one – to discern who was vandalizing the Plaintiff's office – the Court cannot find that the installation of the camera constitutes an adverse employment action.

(iv) <u>Bay requiring the Plaintiff to report early without compensation</u>

The evidence cited by the Plaintiff in support of this contention is a passage from his deposition in which he responds to a question as to what discipline Captain Allen[9] brought against him. The Plaintiff states "That's when he brought against the 15-minute reporting to work. I would come in five minutes before briefing, and then he decided to discipline me because I wasn't reporting to work early – early enough, in their minds." *Docket* # 92-2 at 13.

Once again, this evidence might hint at an adverse action, but lacks sufficient detail to carry the Plaintiff's burden. The Court will assume that an employer's requirement that an employee report earlier for work than other employees, and without compensation for that additional time, can be an adverse employment action. However, the evidence cited by the Plaintiff does not even mention compensation; it only indicates that Captain Allen thought that the Plaintiff should report to work more than five minutes before his shift. Moreover, the excerpt does not indicate that Captain Allen singled the Plaintiff out for this treatment. An employer is free to set the terms of employment, including the times at which an employee must report to work. Without more, the Court cannot say that an instruction by a supervisor that he report to work 15 minutes before his scheduled shift instead of 5 minutes constitutes an adverse employment action.

---

[9]Despite the Plaintiff's representation in his response, Bay is not mentioned in the cited excerpt.

In addition, the excerpt cited by the Plaintiff does not indicate that whatever the "discipline" imposed by Captain Allen was, that it was materially adverse. *Medina, supra.* Moreover, neither the Plaintiff's summary judgment response nor the cited deposition excerpt indicates when this discipline took place, much less show that it was timely under either of the statutes of limitations applicable to the Title VII or § 1981 claims. Accordingly, the Plaintiff has failed to come forward with evidence sufficient to show that this event constitutes an adverse employment action.

(v) <u>July 2003 Internal Affairs investigation</u>

This is a particularly curious contention. According to the Plaintiff's summary judgment response, the adverse employment action at issue is as follows:

> On or about July 31, 2003, Carrero was accused of wrongly denying admission to a jail visitor whom he felt offered questionable identification. Carrero's due process rights were curtailed during the internal affairs investigation, and a hearing panel demoted him and placed him on adminstrative leave. He later learned that Captain Lauderdale testified that Carrero was being terminated, not because of the internal affairs charges, but because the Sheriff's Office claimed Carrero had repeated negative information he heard about the Sheriff.

*Docket* # 92 at 5-6. In stark contrast to this dense narrative, the Plaintiff's only citation to the supporting evidence consists of a six-line excerpt from his deposition. In that passage, a response to a question of whether others were treated differently from him in "this situation" (the "situation" in question is not clear from the supplied excerpt), the Plaintiff responds

> Well, those two, for example. I mean, there's no one else really involved. I guess, part of the evidence too during that is, Bureau Chief Lauderdale testified that the only reason why – part of the reasons why I was terminated – most of the reason why was because I was spreading rumors about Sheriff Grayson Robinson.

24

*Docket* # 92-2 at 5.

Needless to say, this excerpt does nothing to establish the existence of an adverse employment action. It mentions nothing about denying access to a jail visitor, an Internal Affairs investigation, a hearing without Due Process, a demotion, and placement on administrative leave. Indeed, the excerpt does not even affirmatively assert that the Plaintiff was actually terminated. The Court can infer from the passage that the Plaintiff was, in fact, terminated, but curiously, as the quoted text from his summary judgment response indicates, the Plaintiff does not identify the termination as being one of the adverse employment actions he claims. Rather, it alleges only that Lauderdale had given an inconsistent reason for the Plaintiff's termination, not that the termination itself was adverse.

Even assuming that the Plaintiff does contend that this termination was a separately actionable adverse action, it is undisputed that the termination was later rescinded, and the Plaintiff was re-employed. Thus, the Court cannot say that, for disparate treatment purposes, the Plaintiff has come forward with sufficient evidence to demonstrate the existence of an adverse employment action on this issue.

### (vi) Denial of transfer requests out of jail

This portion of the Plaintiff's response recites a litany of allegedly adverse actions: assignment to the jail as punishment; denied requests for reassignment to different jail units; being forced to complete a full training regimen; and a demotion denying him his rank, compensation, and retirement benefits.

Regarding the Plaintiff's contention that he was assigned to the jail as a form of punishment, he cites to the testimony of Mike Dickinson. Notably, Dickinson's testimony never

mentions "punishment." In the cited testimony, Dickinson is asked whether it was departmental policy to "send deputies who needed closer supervision" to jail assignments. Dickinson denied that it was, and stated that each case is assessed on its own merits, depending on the individual circumstances. Dickinson did, however, believe that the Plaintiff's assignment to the jail was an example of a circumstance where an individual was assigned to the jail out of a need for closer supervision. *Docket* # 92-7 at 3. Precisely what this excerpt is intended to prove is unclear. It does not, as the Plaintiff alleges, establish that the Plaintiff was assigned to the jail as a "punishment." At best, it reflects that Sheriff's Department officials believed that the Plaintiff needed closer supervision, and determined that a jail assignment would allow the additional supervision to occur. The Court cannot say that an employer's conclusion that an employee needs additional supervision – particularly following a disciplinary investigation that resulted in the termination of the employee and a subsequent decision to re-hire him – and an assignment of duties consistent with that conclusion is necessarily an adverse employment action.

With regard to the transfer to other jail assignments, as previously explained by the Court, to show that such denied transfers were materially adverse, the Plaintiff must show that they requested assignment offered substantially different benefits or conditions of employment, not merely that he subjectively desired a different assignment. The Plaintiff does not address how the transfers he requested would have significantly altered his terms or conditions of employment, but does appear to suggest that he sought a transfer to an assignment that presented less risk to his safety. However, his only citation in support of the assertion that one assignment was more dangerous than another reveals that this contention is based only on his own subjective and conclusory beliefs as to the safety of the assignment. *Docket* # 92-2 at 3 ("Q: Did you tell

anybody before you resigned that you felt it was unsafe for you?  A: Oh, absolutely.  I told

Hoban.").  This is insufficient to demonstrate that there was a substantial difference between the

assignment he sought and the assignment he had.  At best, it merely demonstrates the Plaintiff's

own subjective reasons for believing that another assignment was more desirable.  However, as

*Sanchez* and *Piercy* establish, the Plaintiff's own subjective desire for another position is

insufficient to show that a denial of a transfer to that position constitutes an adverse action.

The Plaintiff contends that the Defendant forcing him to undergo a full training regimen,

sometimes at the hands of individuals he previously supervised, constitutes an adverse

employment action.  The Plaintiff's own deposition testimony on this issue makes it clear that the

Plaintiff admittedly had not been fully trained for the position, as he admitted that he did not know

everything a jail deputy was required to do.  *Docket* # 92-2 at 4.  Moreover, the cited evidence

merely establishes that the Plaintiff was upset at having to fully train despite having "been in the

jail environment for 3 ½ years already"; it says nothing in support of the Plaintiff's contention that

the persons training him were individuals he had previously supervised.  In any event, the Court

cannot say that an employer's requirement that an experienced employee undergo full training for

a new position constitutes an adverse employment action, as it does not appear to affect the terms

and conditions of the employee's employment in any way.  The Plaintiff may have found it

embarrassing to have to undergo training despite his experience in other job assignments, but a

need to be trained is an essential part of being assigned to a new position.  Accordingly, the

Plaintiff has failed to demonstrate that this constitutes an adverse employment action.

Finally, the Court notes that the Plaintiff cites to no evidence establishing that he was

demoted and denied rank, compensation, or retirement benefits.  The only remaining citation to

the record in this portion of the Plaintiff's response is a conclusory statement during the Plaintiff's deposition that he was denied transfer opportunities while at the jail.[10]  Such a conclusory assertion is insufficient to demonstrate the existence of an adverse employment action.

(vii)  Constructive discharge

Finally, the Plaintiff contends that his resignation constitutes an adverse employment action because he was constructively discharged.

Ordinarily, an employee's voluntary decision to resign would not constitute an adverse employment action, because the decision to resign is one made voluntarily by the employee, not involuntarily imposed by the employer.  However, a constructive discharge occurs when the employer's illegal acts have made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  *EEOC v. PVNF, LLC*, ___ F.3d ___, 2007 WL 1404310 (10th Cir. May 14, 2007).  The intolerability of the working environment is evaluated from an objective standpoint, where neither the employee's subjective views of the situation, nor his employer's subjective intent are relevant.  *Id.*  The Plaintiff's burden to show such intolerability is substantial, and goes beyond merely showing the existence of adverse employment actions; a constructive discharge requires a showing that the working conditions are not only tangible or adverse, but intolerable.  *Id.*  The question is not simply whether conditions were difficult or unpleasant, but whether the conditions were such that the employee was deprived of an opportunity to make any free choice regarding the employment relationship.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

_____

[10]The Court notes that the question following this conclusory assertion states that "You've made a list of these [denied transfer opportunities] and I want to go through these," but the remainder of that discussion is not cited by the Plaintiff nor reproduced in the record.

In presenting the circumstances demonstrating the intolerability of his working conditions, the Plaintiff recites most of the instances discussed above.  Of course, having concluded that the Plaintiff has failed to show that these instances constituted adverse employment actions, the Court cannot say that this conduct was <u>illegal</u>, and thus, does not enter into the constructive discharge calculus.  *See PVNF, supra.* (constructive discharge requires showing that employer's <u>illegal</u> conduct compelled resignation).   Moreover, the Plaintiff's own resignation letter indicates that the Plaintiff was willing to report back to work despite numerous instances of racial slurs and discrimination, discipline, denials of transfers and training, and so on, so long as he was not assigned to the same jail units he had previously supervised.  *Docket* # 92-6.  Because the Plaintiff was willing to agree to tolerate these earlier slights, the question presented on the Plaintiff's assertion of a constructive discharge is whether his reassignment to the jail was so intolerable that a reasonable person would have felt compelled to resign.  The Plaintiff contends that this assignment jeopardized his safety, that it was embarrassing that the Plaintiff had to answer to employees he had previously supervised, that it was "cruel given [his] many years of dedicated and commendable service," and that he had previously complained that the jail was a hostile working environment.

The Court reviews each of these assertions from an objective point of view, disregarding the Plaintiff's subjective opinions and the Defendant's subjective intent.  The Plaintiff contends that his safety was jeopardized by having to work the jail floor with inmates he had previously disciplined, but his citation in support of this contention is only to his own deposition, in which he testifies only that he told others he thought the position was unsafe.  *Docket* # 92-2 at 3.  This is simply a statement of the Plaintiff's subjective opinion that the Court is required to disregard.

29

The Plaintiff cites to no objective evidence that this assignment jeopardized his safety – *e.g.* that it was in violation of Sheriff's Department policies or customary corrections practices; that other deputies who had been placed in such a position were attacked by inmates, etc. The Court can appreciate that the Plaintiff subjectively felt that the situation posed an intolerable threat to his safety, but he cannot prove a claim of constructive discharge solely on the strength of that subjective belief.

The remaining allegations by the Plaintiff raise equally subjective assessments, but fail to show any objectively intolerable conduct. The fact that the Plaintiff was humiliated at being placed under the supervision of former underlings is understandable, but is not a consequence of any conduct shown to be either illegal, nor can the Court find that such humiliation was objectively intolerable. Indeed, being placed in such a humiliating position is largely the inevitable consequence of having been demoted. Whether such an assignment was "cruel" in light of the Plaintiff's years of service is purely a subjective assessment. And the fact that the Plaintiff had previously complained about the jail being a hostile working environment[11] is irrelevant. A complaint is merely an articulation of the Plaintiff's subjective belief about the nature of the environment, not an objective showing that it is, indeed, hostile. In short, the Court has no doubt that, subjectively, the Plaintiff felt that his assignment to the jail was the culmination of a course of conduct that he could no longer tolerate. But this Court must set aside the Plaintiff's own subjective feelings, and examine the conduct objectively, from the standpoint of an reasonable

---

[11]The Court notes that the Plaintiff cites to Exhibit 6 in support of this contention. Exhibit 6 is the deposition testimony of Dickinson, and has no bearing on prior complaints by the Plaintiff. The Court has canvassed the other exhibits attached by the Plaintiff to his response, and finds no evidence that would clearly support this assertion.

employee.  Because the Plaintiff fails to cite to evidence of conduct that is objectively intolerable,

he has failed to show that his voluntary resignation was a constructive discharge sufficient to

constitute an adverse employment action.

Accordingly, because the Plaintiff has failed to demonstrate any adverse employment

action, the Defendant is entitled to summary judgment on his disparate treatment claims under

Title VII and § 1981.

### 2. Hostile Environment Harassment

Although the Plaintiff purports to assert a claim for hostile environment harassment under

both Title VII and § 1981, this Court has previously found **(# 27)** that the Plaintiff failed to

exhaust such a claim under Title VII, and thus, the Court considers this claim only as it arises

under § 1981.

To establish a claim for hostile environment harassment under § 1981, the Plaintiff must

show that his workplace was permeated with discriminatory intimidation, ridicule, and insult that

is sufficiently severe or pervasive so as to alter the conditions of his employment and create an

abusive working environment.  *McCowan v. All Star Maintenane, Inc.*, 273 F.3d 917, 923 (10th

Cir. 2001).  The atmosphere is evaluated from both an objective and a subjective point of view,

examining both whether the Plaintiff subjectively considered his working environment to be so

permeated, and also whether a reasonable employee would have felt so.  *Id., citing Harris v.*

*Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).  It is important to remember that an

environment becomes actionably hostile based on <u>discriminatory</u> ridicule and insult; that is, the

Plaintiff must show that the ridicule and insult at issue occurred <u>because of</u> his Hispanic national

origin.  *See Oncale v. Sundowner Offshore Servcs.*, 523 U.S. 75, 79-80 (1998).  That is, the

31

Plaintiff must show that the person(s) engaging in the harassment did so based on a hostility to him as a result of his Hispanic origin. *Id.*

The Plaintiff's response cites the following incidents as giving rise to his claim of hostile environment harassment: (i) discrete racial insults throughout his career, for which the Plaintiff cites no supporting evidence; (ii) that he and other Hispanic officers were passed over for promotions; (iii) that he complained to the EEOC on three occasions regarding illegal and racist practices; (iv) that his transfer to the jail was punishment for his filing complaints with the EEOC; (v) that he was denied numerous transfers out of the jail; (vi) that he was warned by his supervisor not to coach Deputy Garcia with regard to "the Mexican thing"; (vii) that the Sheriff's Department condoned the segregation of inmates by race, referring to a section of the jail as "Little Mexico"; (viii) that his captain inquired why the Plaintiff had not been written up in some time; and (ix) that a co-worker opined as of 1993 that the Department was targeting the Plaintiff because he is a Mexican.

Most of these assertions are not supported by the evidence that the Plaintiff cites in reliance. As to his contention that he and other Hispanic officers were passed over for promotion, the Plaintiff cites to a section of his deposition that recites only promotions that the <u>Plaintiff</u> applied for (and did not receive). *Docket # 92-2 at 15-17.* Nowhere in this passage does the Plaintiff mention any other Hispanic officers who applied for these or any other positions, nor does the Plaintiff assert that the reason he was not given any of the positions was because of his national origin. Indeed, he does not even contend that he was more qualified than the individuals who were given the positions. As such, this evidence does not suggest that the Plaintiff's working environment was racially hostile. As discussed previously, the Plaintiff misstates the testimony of

Dickinson in contending that he was assigned to the jail as "punishment," and, in any event, the Plaintiff cites to no evidence giving rise to an inference that such "punishment" was related to his race. (Indeed, the Plaintiff himself asserts that it was punishment for filing complaints with the EEOC.) The portion of his deposition that he cites in support of his contention that he was denied numerous transfers out of the jail is completely inapposite; it refers to the Plaintiff's belief that Internal Affairs investigations against him were retaliatory. *Docket* # 92-2 at 22. His assertion that his supervisor asked why the Plaintiff had not been written up in some time is based upon an improper hearsay statement from Lieutenant Hoban, *see* n. 4, *supra,* and misstates the record – according to the Plaintiff's deposition, Bay asked Hoban why the Plaintiff "hadn't been written up for IAs." This statement is far more ambiguous than the Plaintiff's suggestion that Bay wanted the Plaintiff written up at regular intervals, presumably for inconsequential or fabricated offenses. Moreover, and in any event, the Plaintiff does not point to evidence that suggests that Bay's comment to Hoban was because of the Plaintiff's race.

The remaining conduct bears some facial indicia of racial hostility, but is insufficient to set forth a claim of a racially hostile work environment. The Plaintiff asserts that he filed three EEOC charges alleging racially discriminatory conduct. That contention is undisputed (although the charges have not been included in the record by the parties). But the mere fact that the Plaintiff has made accusations of racially discriminatory conduct does not suffice to carry his burden of producing evidence of such conduct. Because the Plaintiff does not point the Court to evidence in the record substantiating the accusations made in his EEOC charges, simply filing the charges themselves does not prove the existence of a hostile working environment.

The Plaintiff also misstates the record regarding his counseling of Deputy Garcia.  The Plaintiff's summary judgment response implies that his supervisors used the phrase "the Mexican thing" when advising the Plaintiff not to assist Deputy Garcia in filing an EEOC charge.  The cited passage in the Plaintiff's deposition does not support such an inference.  In that passage, the Plaintiff states, in response to an unknown subject:

> For example, I gave the example with Deputy Garcia, talking about the Mexican thing, where he came to her.  She revealed to me what was going on and how Brad Reed and Rich Eucler told her that they felt that I was coaching her about the Mexican thing, and that I coached her to file this complaint.

*Docket* # 92-2 at 6.  Nowhere in this passage does the Plaintiff assert that a supervisor made any reference to a "Mexican thing."  Indeed, because the Plaintiff uses the phrase "Mexican thing" before ever speaking of Reed and Eucler, one could reasonably assume that the expression "Mexican thing" is a phrase that the Plaintiff coined to refer to a particular incident, rather than a term actually used by Reed or Eucler.  Accordingly, this evidence does not assist the Plaintiff in showing that the Defendant created a racially hostile working environment by using the term "Mexican thing."

The evidence with regard to the "Little Mexico" issue is also misstated.  The Plaintiff contends in his response that supervisors condoned the segregation of inmates, and that he complained of the practice, but that in April 2002, he was investigated based on his failure to stop deputies from referring to a "Little Mexico."  In support of this contention, he cites only to one short passage in his deposition, in which, asked why he didn't reference black inmates, he responds:

> Because I never seen – on the particular one – when I referenced white inmates would be put in white beds and Hispanic inmates in Mexican beds, those is what I saw on official documentation. Nancy Sivik, who was the one that was doing this, would write, no white beds available, no Mexican beds available.

*Docket* # 92-2 at 19.  Needless to say, this passage says nothing about the supervisors condoning segregation of inmates, the Plaintiff complaining about it, the investigation of the Plaintiff, nor anyone using the expression "Little Mexico."  It merely reveals that one employee made notations on forms, referring to "white beds" and "Mexican beds."  More importantly, the Plaintiff fails to note that, elsewhere in his motion, he cites to his own deposition that, after he complained to his supervisors of Sivik's practice, "a memo [was issued, stating] that you can't do that."  *Docket* # 92-2 at 8.  Thus, this evidence does not indicate that the Plaintiff was subjected to a hostile work environment based on his race; rather, it reflects that, when the Plaintiff brought a complaint to his supervisors about Sivik's practice of referring to "white beds" and "Mexican beds," the Department issued instructions that she cease that practice.

Finally, the Plaintiff cites to an affidavit by Steven Annibali, an individual who was employed by the Department from 1992 to 1997.  Annibali states that, in 1993, Reed made disparaging comments about Mexicans while discussing the Plaintiff's testimony in another case involving racial discrimination.  For obvious reasons, Annibali's affidavit itself is insufficient to demonstrate the existence of any actions constituting a hostile working environment during the time period encompassed by the Plaintiff's § 1981 claim.  At best, Annibali's affidavit might be probative that Reed harbors (or, more accurately, harbor<u>ed</u>) discriminatory animus,  but because the Plaintiff has failed to show any instance of conduct constituting an actionable hostile working environment– whether done by Reed or anyone else – Reed's state of mind is irrelevant.

35

Accordingly, the Court finds that the Defendant is entitled to summary judgment on the Plaintiff's hostile working environment claim.

      3.  <u>Retaliation</u>

Finally, the Court turns to the Plaintiff's claims that he was retaliated against in violation of Title VII and § 1981 for engaging in protected conduct.

To establish a claim of retaliation under either statute, the Plaintiff must first make a *prima facie* showing that he engaged in protected conduct, that he suffered an adverse employment action, and that there is a causal connection between the two events. *Piercy*, 480 F.3d at 1198. The burden then shifts to the Defendant to offer a legitimate, non-retaliatory justification for the action, and the Plaintiff bears the burden of showing the proffered justification to be pretext for retaliation. *Id.* The Defendant contends that the Plaintiff cannot establish the existence of an adverse action or a causal connection with regard to any incident.

      (i) <u>Adverse employment action</u>

At least for Title VII purposes, the definition of "adverse action" is broader in the retaliation context than it is in the disparate treatment context. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct 2405, 2414 (2006). In the retaliation context, the Plaintiff need not show that an action had materially adverse consequences, so long as the action was one which might have dissuaded a reasonable employee from making or supporting a charge of discrimination. *Id.* at 2415. For example, in *White*, the Court found two actions to be adverse for purposes of a retaliation claim, even if those actions would not be sufficiently adverse to support a disparate treatment claim: the reassignment of the employee from more desirable to less desirable

job duties without otherwise affecting her job title or compensation, and the termination of the employee followed by her reinstatement with full back pay.

The Plaintiff's summary judgment response addressing the issue of retaliation[12] specifies the following events that are allegedly adverse employment actions: (i) that he was subjected to unfounded internal affairs investigations after he filed his EEOC complaints; (ii) that he was denied transfers and that other officers were advised not to associate with him; (iii) that his supervisors inquired why he had not been subjected to more investigations; (iv) he was singled or for surveillance and never told about it; and (v) he was scrutinized and held to a different standard than his counterparts.  (The Court notes that, with regard to the last two allegations, the Plaintiff provides no citation to supporting evidence.)

Turning first to the Plaintiff's allegation that being subjected to unfounded Internal Affairs investigations constitute an adverse employment action, the Court notes that the only evidence offered in support of this contention is a two-line fragment of the Plaintiff's deposition that he thought he was retaliated against because of "internal affairs investigations that I thought were bogus." *Docket* # 92-2 at 22.  The mere fact that the Plaintiff thought the investigations were "bogus" does not establish that they were, in fact, unfounded.  Moreover, as discussed above, the Plaintiff has admitted that the investigation regarding the "Little Mexico" issue exonerated him, and he has pointed to no evidence in the record whatsoever detailing his position as to why the

---

[12]Although the Plaintiff has captioned this section of his response "c. Retaliation," he refers to "a litany of acts on behalf of the Sheriff's Office that amounted to racially hostile and discriminatory practices," *Docket* # 92 at 10-11, but does not state that he also believes these practices to be retaliatory.  Nevertheless, the Court will allow itself to be guided by the topic headings in the Plaintiff's response, as assume that this portion of his response is referring to allegedly retaliatory actions.

investigation against him for denying admission to the jail visitor was unwarranted.  In any event, the Court cannot say that, even under the relaxed standard of *White*, investigations, of themselves, can constitute adverse employment actions sufficient to support retaliation claims.  An employer is obligated to investigate allegations of misconduct against its employees, whether those employees have previously engaged in protected activity or not.  And a reasonable employee will accept the notion that he may occasionally be the subject of false accusations in the workplace, and will not allow the threat of an investigation into unfounded accusations of misconduct to dissuade him from engaging in opposition to discrimination, particularly where, as here, the employer readily exonerates him where the accusations are indeed shown to be meritless.   Accordingly, the Internal Affairs investigations of the Plaintiff were adverse actions for purposes of the retaliation claims.

Next, the Plaintiff contends that he was retaliatorily denied transfers and that other employees were told not to associate with him.  In support of these two contentions, the Plaintiff cites to only one portion of his deposition:

> Q: All right.  Now, in one of your complaints, you allege that the captain – I'm assuming this is Tom Bay – was advising other officers not to associate with Carrero.  Anyone other than Mike Morris that you know was advised not to associate with you?
>
> A:  Not that I know of.

*Docket* # 92-2 at 23.  Notably, this contention is not evidence that Bay actually advised any employees not to associate with the Plaintiff.  The question posed is whether the Plaintiff alleges that anyone other than Morris was advised not to associate with him, to which the Plaintiff responds in the negative.  The question does assume as a predicate that the Plaintiff alleges in his

Complaint that Bay advised Morris not to associate with the Plaintiff, but, once again, the fact that the Plaintiff has <u>alleged</u> something to be true is not the same as coming forward with <u>evidence</u> that it is so.  Here, unless the Plaintiff claims to have been present when Bay gave such an admonition to Morris – an allegation the record does not reflect – the Plaintiff would have to present evidence from a party with personal knowledge of this discussion – either through Bay, Morris, or some other person who was present at the time.  He has not done so, and thus, has failed to come forward with evidence to carry his burden in opposing summary judgment.

As noted above, the other component in this allegation is that the Plaintiff was denied transfers as retaliation.  This statement is not supported by a citation to the record, and, ordinarily, that alone would be grounds for the Court to reject it.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (party must point to specific facts in the record supporting allegations in its summary judgment response).  However, the Court notes that the issue of transfers being an adverse employment action was discussed in some additional detail in the Plaintiff's response regarding the disparate treatment claim, although the Plaintiff has not clearly expressed an intention to rely upon those previous citations and argument.  Nevertheless, in order to resolve any doubts in favor of trial, the Court will construe the Plaintiff's summary judgment response liberally, and assume that he intends to assert the same evidence previously presented with regard to denial of requested transfers as an adverse employment action in his disparate treatment claim applies also to his retaliation claim.  Under the relaxed standards of *White*, the Plaintiff's allegations of separate instances in which he was denied reassignments from his position at the jail could be considered sufficiently adverse.  The Court notes that the Plaintiff has shown – at least so long as the evidence is viewed in the light most favorable to him – that he

was seeking reassignment to positions that were subjectively more desirable. As in *White*, where the employee's reassignment to less desirable assignments within the same job classification constituted an adverse action, the Court finds that the Plaintiff here has shown that the denials of his requests for transfers could constitute an adverse action for purposes of a retaliation claim.

The Plaintiff's remaining claims of adverse employment actions are without merit. For reasons discussed previously, the Court finds that the Plaintiff has misstated the nature of the record with regard to his contention that his supervisors were requiring that he be written up for discipline on a regular basis, regardless of whether he had engaged in misconduct or not. Similarly, the Court has found that the Plaintiff's evidence regarding additional surveillance resulting from the camera in his office is insufficient to show that any action was taken as a result. Finally, the Plaintiff cites to no support for the proposition that he was held to a different standard than his counterparts.

(ii) <u>Causal connection</u>

The Court then turns to whether the Plaintiff has shown a causal connection between his protected conduct and the denials of the transfers. An employee can show such a causal connection merely by establishing that the adverse action occurred in close temporal proximity to the protected conduct. *Piercy*, 480 F.3d at 1198. A "close temporal proximity," however, means a span of weeks. The 10th Circuit has held that a delay of three months was not sufficient, of itself, to establish the connection. *Id.*. If the Plaintiff cannot establish a causal connection by temporal proximity alone, he must come forward with additional evidence suggesting a causal connection between the protected conduct and the adverse action. *Id.* at 1198-99.

40

Of course, before the Court can examine the temporal proximity of the Plaintiff's protected conduct and the denial of the transfers from the jail, it must first determine when these events took place.  This exercise is complicated by the fact that the Plaintiff's response does not clearly identify the dates of relevant conduct, or mentions them only with regard to other events whose dates are not entirely clear.  The Plaintiff's filing of EEOC charges is indisputably protected conduct, and although those charges are not squarely in the record before the Court on summary judgment, a review of the docket in this case reveals that those charges were filed on December 3, 1998; January 17, 2001; and on or about December 29, 2003.  Arguably, the Plaintiff's assistance to Deputy Garcia's filing of an EEOC charge is protected conduct, and the record reflects that this occurred in or about March 2002.  *Docket* # 92-2 at 7.  Although the Plaintiff may assert that his complaints to his supervisors about racial segregation in the jail also constitutes protected conduct, the Court finds that, regardless of whether it does or not, the Plaintiff has not pointed to evidence in the record establishing when that complaint occurred.[13]

Discerning the dates of the denial of transfers is equally challenging.  Although the Plaintiff contends that he was first denied a transfer out of the jail in April 2002, he cites to no evidence in the record establishing that date.  There is some evidence in the record that the Plaintiff applied for positions in September 2002, December 2002, March 2003, August 2003, and September 2003, and did not receive them, but it is not clear whether the Plaintiff was assigned to the jail at this time.  *Docket* # 92-2 at 15-17.  Nevertheless, the Court has canvassed the entirety of the Plaintiff's deposition excerpts in the record and can locate no other evidence as to the dates upon

---

[13]The Plaintiff asserts in his response that it was on March 18, 2002, but cites to no evidence in the record supporting that contention.

41

which he was denied transfers.  In the absence of any other evidence in the record, the Court

confines its analysis to the instances cited above.

      As is abundantly clear, the denial of the Plaintiff's requests for promotions/reassignments

between September 2002 and September 2003 are not in close temporal proximity to any of the

protected conduct in this case.  The Plaintiff's 2001 EEOC charge preceded the earliest of these

applications by more than 18 months, and his assistance to Deputy Garcia predated the earliest

application by roughly six months.  Accordingly, the Plaintiff must cite to additional evidence

demonstrating a causal connection between his protected conduct and the denial of transfers out

of the jail.

      The only additional evidence in the record on this point is a portion of the Plaintiff's

deposition in which he alleges that, during a discussion with Lauderdale, Lauderdale told the

Plaintiff that any request he made for transfer out of the jail would not be granted because

management was trying to punish him by keeping him at the jail.  *Docket* # 92-2 at 20.  In that

same passage, the Plaintiff also testifies that Bay told him that he "burned too many bridges" and

"can't keep [his] mouth shut."  Taken in the light most favorable to the Plaintiff, the Court finds

that this evidence could support a causal connection between the Plaintiff's engaging in protected

conduct and his denial of one or more transfers out of the jail.  Accordingly, the Defendant is not

entitled to summary judgment on the Plaintiff's Title VII and § 1981 claims involving retaliation,

and only those claims will proceed to trial.

      To be clear, the issues to be heard at trial are extremely narrow.  The Plaintiff has only

come forward with evidence that transfers he sought between September 2002 and September

2003 were denied as a result of retaliation in violation of Title VII and/or § 1981, and the trial of

this matter will focus <u>only</u> on the particular transfer requests.  Specifically, the only adverse actions that will be considered by the jury will be the denials of the Plaintiff's applications for positions discussed at pages 370 and 371 of the Plaintiff's deposition.  The Defendant is entitled to judgment on any other transfer requests, as the Plaintiff has failed to come forward with evidence of any other requests.

### D.  Statute of limitations

It is unnecessary to directly address the Defendant's statute of limitations defense.  As discussed *supra*, the Court has confined its analysis to those events arising within the relevant statutes of limitations, and the claims that are proceeding to trial are clearly timely under Title VII, § 1981, or both.

### E.  Rule 702 motion

The Court simply advises the parties that, to the extent the Plaintiff contends that the parties' Stipulation regarding expert testimony purports to continue to assert the Plaintiff's Motion to Exclude testimony by the Defendant's expert with regard to Opinion # 1, that motion is denied.  The Court will entertain challenges pursuant to Rule 702 only in the form required by the Court's Rule 702 procedures.[14]

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's Motion for Summary Judgment is **GRANTED IN PART**, insofar as the Defendant is entitled to summary judgment on the Plaintiff's First Amendment claim, the Plaintiff's Title VII and § 1981 claims to the extent they assert disparate treatment or a hostile working Environment, and the Plaintiff's Title VII and § 1981 claims to

---

[14]http://www.co.uscourts.gov/judges/msk_702procedures.pdf

extent they assert retaliation based on anything other than the denial of transfers out of the jail in September 2002 and September 2003 as discussed herein, and **DENIED IN PART**, insofar as the Plaintiff's Title VII and § 1981 retaliation claims will proceed to trial only with regard to the Plaintiff's assertion that the Defendant retaliated against him by denying him one or more transfers from his assignment to the jail between September 2002 and September 2003 as discussed herein.

Dated this 5th day of June, 2007

BY THE COURT:

Marcia S. Krieger
United States District Judge